328 P.3d 341

Gerard R. LALES, Respondent/Plaintiff–Appellant,

v.

WHOLESALE MOTORS COMPANY, dba JN Automotive Group, Johnny Martinez, and Gary Marxen, Sr., Petitioners/Defendants–Appellees.

No. SCWC–28516.

Supreme Court of Hawai'i.

Feb. 13, 2014.

Christopher J. Muzzi, Honolulu, for petitioner.

Daphne E. Barbee, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., Circuit Judge BROWNING, assigned in place of POLLACK, J., recused, with ACOBA, J., Concurring and Dissenting Separately.

Opinion of the Court by
RECKTENWALD, C.J.

Gerard R. Lales filed a civil complaint against his former employer and supervisors for discriminatory conduct he allegedly suffered while employed as a car salesman.[1] Lales alleged that he was subjected to derog-

atory comments about his French national origin, and that he was terminated because he complained about the discriminatory conduct. Lales alleged state harassment and retaliation claims, federal harassment and retaliation claims, unlawful termination as against public policy, and breach of his employment contract. All of the claims were alleged against each of the Defendants. Defendants asserted that Lales was not discriminated against during his employment, and that he was terminated because he lied to a customer.

The circuit court granted summary judgment in favor of Defendants. On appeal, the Intermediate Court of Appeals vacated in part and affirmed in part, and remanded to the circuit court for further proceedings. *Lales v. Wholesale Motors Co.*, No. 28516, 127 Hawai'i 412, 2012 WL 1624013 (Haw. App. May 9, 2012). Specifically, the ICA vacated the circuit court's grant of summary judgment in favor of the employer and one of Lales's supervisors on the state harassment and retaliation claims, and vacated the grant of summary judgment in favor of the employer on the federal harassment and retaliation claims, as well as the public policy claim. The ICA affirmed the circuit court's grant of summary judgment on the remaining causes of action.[2]

As set forth below, we affirm in part and vacate in part the judgment of the ICA. Specifically, we conclude that individual employees are not liable as "employers" under HRS §§ 378–2(1)(A) and 378–2(2). Accordingly, we vacate the ICA's judgment on COAs 1 and 2, with respect to supervisor Marxen, and affirm the circuit court's grant of summary judgment in favor of Marxen on those causes of action.

We affirm the ICA's judgment with respect to the remaining causes of action. Specifically, with regard to the federal harassment claim against JN, we conclude that the affirmative defense set forth in *Faragher v.*

1. Lales was formerly employed by Wholesale Motors Company, dba JN Automotive Group (JN), and his former supervisors were Johnny Martinez and Gary Marxen, Sr. The employer and supervisors are referred to collectively as "Defendants."

2. As discussed *infra* note 9, the ICA's affirmance on these causes of action has not been challenged. Accordingly, we do not address them.

*City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), does not support summary judgment because there remain issues of material fact as to whether JN's actions culminated in Lales's termination. We also take this opportunity to clarify that the *Faragher* affirmative defense is not applicable under Hawai'i's anti-discrimination laws because the administrative rules of the Hawai'i Civil Rights Commission hold employers strictly liable for the discriminatory conduct of their agents and supervisory employees. Finally, we conclude that there were genuine issues of material fact regarding whether JN's proffered reasons for Lales's termination were pretextual, that Lales produced sufficient evidence to raise genuine issues of material fact as to his state and federal harassment and retaliation claims, and that the basis for Lales's public policy claim is not clear from the record.

## I. Background

The following factual background is taken from the record on appeal.

### A. Discrimination Complaints

Lales filed a discrimination complaint against his employer, JN, and his supervisor, Marxen, with the Equal Employment Opportunity Commission (EEOC). In a declaration attached to his complaint, Lales alleged that he was employed as a salesperson with JN Chevrolet from July 18, 2001, until June 23, 2002. During that time, Lales alleged that he was subject to derogatory remarks based on his French national origin by his supervisor Marxen, other supervisors, and co-workers. For example, Lales alleged the following:

> Gary Marxen, the General Sales Manager, called me Frenchy[ ], and he wanted that name on my business card. I protested, however I was called "Frenchy" on a daily basis by Gary Marxen, other supervisors and co-workers. Gary Marxen frequently referred to me as a "french bastard", and told me to go back to my country because America does not need French people.
>
> . . .
>
> Gary Marxen told Johnny Martinez, a salesperson who started at about the same time I did, "to go and kick the ass of that French bastard." Johnny Martinez repeatedly harassed me by calling me "Frenchy" and telling me that "the French are useless bastards". I complained about Johnny Martinez' derogatory remarks and threats.
>
> Johnny Martinez was promoted to Sales Manager in approximately November, 2001. Despite my complaints about his discrimination and harassment I was transferred to his sales team. I told Gary Marxen that I opposed this transfer. He responded by saying, "fuck you, you French mother fucker, then you are fired." I did not want to lose my job so I remained on Johnny Martinez' sales team. While on his sales team Johnny Martinez continued to harass me and discriminate against me. I protested the discrimination and harassment and months later was allowed to transfer to Carlton Hill's team. On April 2, 2002 Johnny Martinez threatened my [sic] me. At the time of this threat Johnny Martinez had just returned from a suspension for threatening an electrician who worked on property. He was again suspended for threatening me.
>
> In late May, Johnny Martinez again threatened me. I told Gary Marxen and Johnny Martinez that I was going to contact my lawyer. After I threatened to contact a lawyer, Johnny Martinez was terminated.
>
> Shortly after Johnny Martinez'[s] termination I was transferred to Joey Dempsey's sales team. Joey Dempsey was a friend of Johnny Martinez. On my first day on his team Joey Dempsey told me that he was going to get me fired. I was terminated about 3 days later.
>
> I was terminated on June 23, 2002.

The EEOC issued a "determination as to the merits of the subject charge" (EEOC Determination). The EEOC determined that it was unable to conclude that Lales was discharged in retaliation for opposing discrimination in the workplace, but that "there [was] reasonable cause to believe that [JN] discriminated against [Lales] because of his national origin." The EEOC also transmitted the complaint to the HCRC.

The HCRC subsequently issued Lales a "Notice of Dismissal and Right to Sue" letter (Right to Sue Letter). The Right to Sue Letter informed Lales of his right to "file a private lawsuit against the Respondent in the State [c]ircuit [c]ourt[.]"

## B. Circuit Court Proceedings

Lales filed a civil complaint in the circuit court against Defendants. He subsequently filed an amended complaint, asserting six causes of action (COA) against Defendants: (1) "discriminatory acts" in violation of Hawai'i Revised Statutes (HRS) chapter 378 (COA 1 or state harassment claim); (2) retaliatory discharge in violation of HRS chapter 378 because Lales filed a discrimination complaint (COA 2 or state retaliation claim); (3) breach of the employment contract (COA 3 or employment contract claim); (4) unlawful termination as against public policy (COA 4 or public policy claim); (5) "discriminatory acts" in violation of section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 [3] (COA 5 or federal harassment claim); and (6) retaliatory discharge for opposing Defendants' harassment in violation of section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) [4] (COA 6 or federal retaliation claim).

### 1. Marxen's motion for summary judgment

Marxen filed a motion for summary judgment and argued, inter alia, that Lales did not obtain a Right to Sue Letter against Marxen.[5] Marxen asserted that the EEOC Determination and the Right to Sue Letter did not mention or refer to Marxen as a party, nor did Marxen receive notice that he was a party to the complaint. In the alternative and citing *Maizner v. State of Hawai'i, Department of Education*, 405 F.Supp.2d 1225 (D.Haw.2005), Marxen asserted that HRS chapter 378 precluded Lales from filing suit against individuals.

Attached to Marxen's motion for summary judgment was his declaration, in which he stated, inter alia, that he was JN's General Car Sales Manager and that his duties included "hiring and firing of sales personnel, evaluation of sales personnel and managing sales personnel." Marxen stated that Lales was not subject to discrimination or retaliation based on national origin, Lales was transferred from Martinez's sales team because of a "personality conflict," and Lales had not submitted any written complaints or made any oral complaints alleging discrimination or harassment. Marxen further stated that Lales referred to himself as "Frenchy," and asked and encouraged others to do the same. Marxen also stated the following:

> 8. [ ] Lales received his termination notice on June 23, 2002 for missing a mandatory sales meeting and lack of production in sales. Thereafter, [ ] Lales approached me and pleaded to keep his employment promising he could improve his sales figure. Based upon his

---

3. 42 U.S.C. § 2000e-2(a)(1) provides:

 (a) Employer practices
 It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

4. 42 U.S.C. § 2000e-3(a) provides:

 (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

5. Martinez also filed a motion for summary judgment, arguing that Lales failed to exhaust his administrative remedies by not obtaining a Right to Sue Letter against Martinez. The circuit court granted summary judgment in favor of Martinez, and this ruling was not challenged on appeal or on certiorari.

representations, I withdrew the termination notice.

9. [ ] Lales sold a vehicle to [customers] that did not have air conditioning but [ ] Lales represented to the [customers] that the vehicle did come with air conditioning.

10. On June 24, 2002, [ ] Lales'[s] termination was reinstated after an investigation revealed that [ ] Lales was told the vehicle he sold did not have air conditioning but he misrepresented to the customers that it did. The termination notice was changed to reflect the June 24, 2002 termination date and reason for termination as lying to a customer.

Various exhibits were also attached to Marxen's motion for summary judgment. Attached as Exhibit D was Lales's Response to Defendants' Request for Admissions, in which Lales admitted that, while employed by JN, he used the nickname "Frenchy" when referring to himself, referred to himself as "Frenchy" in written documents, and he did not submit any written complaints of discrimination or harassment by co-workers or management based upon his national origin.

Attached as Exhibit E to Marxen's motion for summary judgment was a copy of the Termination Report dated June 23, 2002, in which Lales was dismissed from the company for "missed training meeting—6/17/02" and "lack of production." Attached as Exhibit F was a copy of the June 23, 2002 Termination Report that had been subsequently re-dated June 24, 2002, and that had additional comments: "lied to customer and the Used Car Manager[ ] causing us to install air conditioning[.]"

Lales filed a memorandum in opposition to Marxen's motion. Lales conceded that Marxen could not be held individually liable under Title VII, but that pursuant to HRS §§ 378–1 and 378–2 and Hawai'i case law, he was allowed to file discrimination and retaliation complaints against Marxen individually. Attached to the memorandum in opposition was Lales's declaration, in which he stated, inter alia:

5. ... Marxen referred to me as "fucking French bastard," "Frenchie," made derogatory remarks about French people, told ... Martinez to "beat my fucken French ass," and made remarks about French people. I was also subjected to ancestry harassment by [ ] Martinez and other employees at my workplace .... During my work at [JN], someone placed feces on my car, for which a police report was made.

6. [ ] Martinez was my immediate supervisor and referred to me as "French fries," "Pepe Le Pieu," I was told that I stink, that French women are just whores, "French are whimps [sic]" and other derogatory remarks. I asked to be transferred because of [ ] Martinez's behavior towards me which included threats.

. . . .

10. I was told I could participate in [a] radio show, however, this was stopped by [ ] Marxen who said he did not want my French accent on the radio to sell American cars.

. . . .

12. I was terminated for false reasons, specifically that I did not sell enough vehicles. This is untrue. The sales statistics show that I did not have the lowest sales at the time of my termination.

13. I was not told I was terminated for selling a truck which did not contain air conditioning to a customer. I did not see the termination notice ... and did not sign that notice. I deny that I told the customer the truck had air conditioning.

14. I was told I was terminated for not attending a meeting. However, I was not aware of a sales meeting and did not recall receiving notice concerning this meeting. I have not known anybody to be terminated for not attending a sales meeting.

15. Before I was terminated, I complained orally to [ ] Marxen that I did not appreciate the remarks made concerning my ancestry. I also complained to my co-workers and others.

I even sought advice from an attorney ... about the hostile work environment and anti-discrimination on the basis of ancestry.

The circuit court subsequently granted summary judgment in favor of Marxen. The circuit court stated that, with regard to the federal discrimination and retaliation claims (COAs 5 and 6), Lales conceded that suit against individuals was "impermissible." As to COAs 1–4, the circuit court determined that Lales did not receive a Right to Sue Letter against Marxen because Marxen was not mentioned in the HCRC's right to sue letter.

**2. JN's motion for summary judgment**

█ JN also filed a motion for summary judgment. JN argued that it was entitled to summary judgment on Lales's retaliation claims (COAs 2 and 6) because there was a strong inference that JN had no discriminatory motive, and Lales could not produce any evidence that he was engaged in a protected activity.[6] JN also argued that it was entitled to summary judgment on Lales's discrimination claims (COAs 1 and 5) because Lales failed to provide evidence that he was subjected to unwelcome verbal or physical conduct based on his national origin, Lales did not follow JN's procedure for filing harassment complaints, and there was no evidence that Lales suffered any injury because of the alleged discriminatory actions. Finally, JN asserted that it was entitled to summary judgment on Lales's breach of contract claim (COA 3) because it had no knowledge of the alleged discriminatory conduct. Although JN requested summary judgment as to all COAs, it did not provide any arguments to support summary judgment on the public policy claim (COA 4).

JN attached to its motion for summary judgment the declarations of several of its employees and numerous exhibits. The declarations and exhibits set forth a version of the work environment and the events that led to Lales's termination that differed from the facts set forth in Lales's declaration. Several individuals declared that Lales introduced himself, and requested that he be called, by the nickname "Frenchy." Marxen's son, the Used Vehicle Manager for JN, declared that he specifically asked Lales, before Lales sold the truck to the couple, whether Lales had informed the couple that the truck did not have air conditioning. Lales responded that he told the customers that the truck did not come with air conditioning. According to the declarations of Marxen, two Assistant Sales Managers, and the deposition of the husband, the couple returned the day following their purchase and demanded that JN provide air conditioning based on Lales's assurances.

Attached as Exhibit Q to JN's motion for summary judgment was Lales's amended response to the request for admissions, wherein Lales admitted that, while employed by JN, he did not submit any written complaints to JN regarding people calling him "Frenchy" instead of Alex or Gerard, and he requested to be transferred to another sales team because he had a personality conflict with Martinez.

Lales filed a memorandum in opposition to JN's motion for summary judgment. Lales argued that he established a prima facie case of retaliatory termination and that he raised facts that supported an inference that JN's proffered reason for his termination was pretext. Lales also asserted that summary judgment was not warranted because he presented material issues of fact in regard to his claim of harassment. Specifically, Lales pointed to his own declaration, in which he asserted that he was subjected to derogatory remarks and slurs about his French ancestry and national origin by JN employees. In

---

6. As explained further *infra*, Title VII and HRS § 378–2 protect an employee from discriminatory retaliation. As this court noted in *Schefke v. Reliable Collection Agency*, 96 Hawai'i 408, 425–26, 32 P.3d 52, 69–70 (2001), retaliation claims are subject to a burden shifting analysis, in which: (1) the plaintiff must first establish a prima facie case of retaliation by showing that (a) he or she was engaged in a protected activity, (b) his or her employer subjected the employee to an adverse employment action; and (c) a causal link existed between the protected activity and the adverse action; (2) the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision; and (3) the burden then shifts back to the plaintiff to demonstrate that the defendant's offered reason for its action was pretext for a discriminatory motive.

addition, Lales argued that he presented material issues of fact that he suffered damages and that he should be awarded punitive damages for JN's "egregious [and] outrageous" conduct. Lales did not contest the dismissal of the breach of contract claim against JN.

Attached to Lales's opposition was his declaration, which relayed facts substantially similar to those in the declaration he submitted in opposition to Marxen's motion for summary judgment. In addition, Lales declared:

18. In late May 2003,[7] I verbally complained to [ ] Marxen about the harassment and [ ] Martinez

19. [ ] Marxen told me "You Fucking French Bastard, get out of my office". He told [ ] Martinez to "beat his F* * * * * * French Ass".

. . . .

24. On June 23, 2006, within a month after I complained to [ ] Marxen, I was terminated for false reasons, specifically that I did not sell enough vehicles by [ ] Marxen. This is untrue. The sales statistics show that I did not have the lowest sales at the time of my termination. I was told I was terminated for not attending a meeting. However, I was not aware of a sales meeting and did not recall receiving notice concerning this meeting. I have not known anybody to be terminated for not attending a sales meeting. After questioning these reasons, [ ] Marxen changed his mind and allowed me to continue to work.

25. On June 24, 2006, I was terminated and told to leave for selling a Truck without air conditioning in it. This reason is false. I did not see nor sign the termination notice dated June 24, 2006. I deny that I told the customer the truck had air conditioning. The sales agreement does not list that the Truck had air conditioning. The Blue Book document given to [the customer] show the Truck was sold "as is", without air conditioning.

26. Other employees told [the customer] that the Truck had air conditioning in it and were not fired.

Lales also attached numerous exhibits to his opposition to JN's motion for summary judgment. Attached as Exhibit 11 were excerpts from Lales's deposition. Lales stated that he complained to Marxen approximately one month before he was terminated that he was "really tired" of Martinez's behavior toward him, specifically, "the way he treated me, the way he would almost on a daily basis threaten me physically to go to the boneyard and retaliating against me on a daily basis." The following conversation occurred:

Q. What did Martinez do to retaliate against you?

A. To retaliate against me, Martinez would—the only way Martinez could pick on me was the way I was different. I was different in the bunch. I mean, I was a different person. I mean, I'm French, and I was different. So he couldn't pick on me at my work, my attendance, so he would pick on me the way I am. I'm French.

Q. Is there anything else you told [ ] Martinez?

A. Oh, I told [ ] Marxen that all this Frenchy thing already, I was just ... fed up with it. It had to stop. And not only that, [ ] Marxen didn't only tolerate this abuse, daily abuse to me, he encouraged it.

Q. And you told [ ] Marxen that?

A. I did.

Q. Is there anything else you told [ ] Marxen?

A. Yes. I don't recall at this time right now, but we had a good 20 minutes. Martinez was present.

Q. [ ] Martinez was present?

A. Yes, he was.

Q. Okay. And what did [ ] Martinez say?

A. [ ] Martinez said you French bastard, F-you, F-you, F-you, F-you. And ... Marxen told [ ] Martinez to kick this French bastard ass.

---

**7.** Lales was terminated in 2002; his reference to verbally complaining to Marxen in 2003 and subsequent references to his termination in 2006 appear to be incorrect.

Q. At the meeting?

A. Yeah, at that meeting one month before I got retaliated[.]

In his deposition, Lales also discussed working on Martinez's sales team, and then stated that Paul Tucker, the desk manager, transferred Lales to another team after Lales complained about Martinez. Lales stated that he told Tucker that Martinez was discriminating against him, harassing him, and physically threatening him.

The circuit court granted JN's motion and subsequently entered its Final Judgment. The circuit court subsequently filed an Amended Final Judgment, entering judgment in favor of Defendants and against Lales on all of Lales's COAs. Lales appealed the Amended Final Judgment.

## C. ICA Appeal

Lales's Opening Brief raised five points of error, three of which are relevant to his application. Lales argued that the circuit court erred in granting summary judgment in favor of Marxen because Lales had a Right to Sue Letter that allowed him to file suit against Marxen for his discriminatory actions. Lales also contended that the circuit court erred in granting summary judgment in favor of JN because the circuit court: (1) viewed the evidence in the light most favorable to JN, contrary to the legal standard of viewing evidence in the light most favorable to the non-moving party; (2) "erroneously ruled that when the same actor is both responsible for hiring and firing of an employee, a strong inference arises that there was no discriminatory motive"; and (3) erroneously applied the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), to Lales's state harassment claim. Specifically, Lales, citing HAR § 12–46–175, asserted that JN was strictly liable for the discriminatory actions of its supervisory employees.

In their Answering Brief, Defendants argued that the circuit court properly granted summary judgment in favor of Marxen because Marxen's name was not contained in the HCRC's Right to Sue Letter. With regard to summary judgment in favor of JN,

Defendants contended that "the only evidence [Lales] could produce to support his contentions was his own conflicting testimony and inadmissible hearsay." Defendants noted "numerous discrepancies in [Lales's] testimony[.]" Defendants also argued that, contrary to Lales's assertion, HRS chapter 378 does not mandate that an employer be held strictly liable for harassment by its supervisors. Defendants further argued that the circuit court properly granted summary judgment because there was no breach of contract and there was no public policy violation.

On May 9, 2012, the ICA issued a memorandum opinion vacating in part and affirming in part the circuit court's Final Amended Judgment. *Lales*, 2012 WL 1624013, at *1, *18. In regard to the circuit court's grant of summary judgment in favor of Marxen on COAs 1 and 2 (state harassment and retaliation claims), the ICA concluded that the HCRC's Right to Sue letter was sufficient to authorize Lales to file suit against Marxen. *Id.* at *9. In addition, citing the plain language of HRS § 378–2 and the definition of "employer" in HRS § 378–1, the ICA determined that "an individual employee, who is an agent of an employer, can be held individually liable as an 'employer.'" *Lales*, 2012 WL 1624013, at **10–12. Moreover, the ICA noted that employees are subject to individual liability when they aid and abet prohibited discriminatory practices, as set forth in HRS § 378–2(3). *Id.* at *10. The ICA then cited with approval the federal district court's decision in *Sherez v. State of Haw. Dep't of Educ.*, 396 F.Supp.2d 1138, 1146–48 (D.Haw. 2005), because *Sherez* offered a "persuasive" rationale that employees could indeed be held individually liable for discriminatory conduct. *Id.* at *11.

The ICA also cited cases from this court that "support the conclusion that liability under HRS § 378–2 extends to employees in their individual capacity." *Lales*, 2012 WL 1624013, at *12 (citing *Steinberg v. Hoshijo*, 88 Hawai'i 10, 960 P.2d 1218 (1998); *Sam Teague, Ltd. v. Haw. Civil Rights Comm'n*, 89 Hawai'i 269, 275–77, 971 P.2d 1104, 1110–12 (1999); and *Schefke*, 96 Hawai'i 408, 32 P.3d 52). Thus, the ICA determined that

Lales was entitled to file suit against Marxen in his individual capacity under HRS § 378-2, and therefore, the circuit court erred in granting summary judgment in favor of Marxen on COAs 1 and 2. *Lales*, 2012 WL 1624013, at *12, *18.

The ICA then addressed the circuit court's grant of summary judgment in favor of JN. *Id.* at **13-18. With regard to COA 1 (state harassment claim), the ICA determined that under HAR § 12-46-175, employers are strictly and vicariously liable when a supervisor harasses an employee. *Lales*, 2012 WL 1624013, at **13-15. The ICA then discussed the rule set forth in *Faragher*, as applied to Title VII claims. *Id.* at **14-15. The ICA stated that an employer may raise the *Faragher* affirmative defense only when no tangible employment action is taken against an employee, and noted that the defense requires that: (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *Id.* at *14. The ICA stated that because the alleged harassment by Marxen did not culminate in Lales's discharge, the *Faragher* affirmative defense did not apply. *Id.* at *15. The ICA further stated that because the requirements set forth in *Faragher* were not met in this case, there was no need to address whether the affirmative defense would apply under HRS chapter 378. *Id.* Finally, the ICA stated that the circuit court erred in applying *Faragher*. *Id.*

The ICA then determined that when the evidence was viewed in the light most favorable to Lales, the circuit court erred in granting summary judgment in favor of JN on the state and federal harassment claims (COAs 1 and 5), because "the matters set forth in Lales's declaration ... established that there were genuine issues of material fact regarding his claims[.]" *Id.* at **15-16.

In regard to the circuit court's grant of summary judgment in favor of JN on COAs 2 and 6 (retaliation claims), the ICA stated that, given the conflicting evidence of the parties, which must be viewed in the light most favorable to Lales, there was sufficient evidence to establish a prima facie case of retaliation and that "Lales presented sufficient evidence to establish genuine issues of material fact regarding whether JN's proffered reasons for Lales's termination were pretextual." *Id.* at **16-17.

The ICA further determined that the circuit court erred in granting summary judgment in favor of JN on COA 4 (public policy claim) because Lales was not given a fair opportunity to respond inasmuch as JN did not address this claim in its motion for summary judgment. *Id.* at *18. Additionally, the ICA noted that "to the extent that Lales's COA 4 is based on public policy derived from the provisions of HRS [c]hapter 378, it would be barred." *Id.* However, the ICA determined that because the substance of the public policy claim was "unclear," and given that it was remanding the case for further proceedings, it would also vacate the circuit court's grant of summary judgment in favor of JN as to COA 4. *Id.*

Accordingly, the ICA vacated the circuit court's Amended Final Judgment to the extent that it entered summary judgment in favor of Marxen on COAs 1 and 2, and entered judgment in favor of JN on COAs 1, 2, 4, 5, and 6. *Id.* The ICA affirmed the Amended Final Judgment on all other causes of action.[8] *Id.* The ICA remanded the case to the circuit court for further proceedings. *Id.*

The ICA filed its Judgment on Appeal on July 6, 2012. Defendants timely filed an application for writ of certiorari, and raise the following questions:

I. Did the ICA make grave errors of fact by (1) largely ignoring the evidence presented by [Defendants], and only viewing [Lales's] "evidence" in the

---

8. The ICA also affirmed the circuit court's grant of summary judgment in favor of: (1) Martinez on all COAs; (2) Marxen on COAs 3 through 6; and (3) JN on COA 3. *Id.* In addition, the ICA vacated the circuit court's award of attorney's

fees and costs in favor of Defendants. *Id.* These determinations are not challenged on appeal to this court and thus, they are not discussed further.

light most favorable to him; (2) relying on conflicting "evidence" and uncorroborated self-serving statements submitted by [Lales] in a sham declaration; and (3) considering [Lales's] other inadmissible evidence[?]

II. Did the ICA err in concluding that individual employees can be held liable as an employer under HRS § 378–2(1) and (2) in reliance on *Sherez v. State of Hawai'i [Dep't] of Educ.*, 396 F.Supp.2d 1138 (D.Haw.2005), which has not been followed by the [United States District Court] since the Ninth Circuit ruled to the contrary in a memorandum decision in *Lum v. Kauai County Council*, 358 Fed. Appx. 860, 862 (9th Cir. [ ] 2009)?

III. Did the ICA err by ignoring a substantial body of federal law to the contrary when it concluded that the *Faragher* affirmative defense cannot apply where a supervisor's harassment culminates in tangible employment action?

IV. Did the ICA err when it concluded that [Lales] had submitted sufficient evidence that the reason for his firing was pretextual, because the ICA evaluated whether the reason for [Lales's] termination was objectively correct rather than whether the [Defendants] believed that reason was correct?

V. Did the ICA err when it held that the [c]ircuit [c]ourt should not have granted summary judgment on Count 4?

(Formatting altered).

## II. Standards of Review

### A. Summary Judgment

■ "On appeal, the grant or denial of summary judgment is reviewed de novo." *First Ins. Co. of Haw. v. A & B Props., Inc.*,

126 Hawai'i 406, 413, 271 P.3d 1165, 1172 (2012) (citing *Nuuanu Valley Ass'n v. City & County of Honolulu*, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008)). Furthermore,

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* at 413–14, 271 P.3d at 1172–73 (citation omitted).

### B. Statutory Interpretation

■ "Statutory interpretation is a question of law reviewable de novo." *First Ins.*, 126 Hawai'i at 414, 271 P.3d at 1173 (citation omitted).

## III. Discussion

### A. Marxen was not subject to individual liability under HRS §§ 378–2(1)(A) and 378–2(2) for Lales's state harassment and retaliation claims (COAs 1 and 2)

■ The Defendants argue that Marxen was not subject to individual liability for Lales's state harassment claim (COA 1) under HRS § 378–2(1)(A), or his state retaliation claim (COA 2) under HRS § 378–2(2), because those sections do not impose liability on individual employees.[9] We agree. The legislature's inclusion of "agent" in the definition of "employer" under HRS § 378–1 did

9. We do not reach the issue of Marxen's individual liability based on HRS § 378–2(3). *See* dissenting opinion at 367–69, 328 P.3d at 376–78. Lales did not allege—in either his Amended Complaint, responses to Defendants' motions for summary judgment, or appeal to the ICA—that Marxen was individually liable under HRS § 378–2(3), and therefore, any argument now raised is waived. *See Kau v. City & County of Honolulu*, 104 Hawai'i 468, 474 n. 6, 92 P.3d 477, 483 n. 6 (2004) (" 'Legal issues not raised in the trial court are ordinarily deemed waived on appeal.' " (quoting *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002))).

not signal an intent to impose liability on individual employees. Instead, by using the term "agent," the legislature did nothing more than ensure that employers would be liable for the discriminatory conduct of their agents. Individual employees are therefore not personally liable as "employers" for harassment and retaliation claims under HRS §§ 378–2(1)(A) and 378–2(2).

▬ It is well established that the "fundamental starting point for statutory interpretation is the language of the statute itself." *State v. Wheeler*, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (citation omitted). Where the statutory language is plain and unambiguous, this court's sole duty is to give effect to its plain and obvious meaning. *Id.* As relevant here, HRS § 378–2 (Supp. 2002) [10] provided the following:

> It shall be an unlawful discriminatory practice:
>
> (1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
>
> (A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment;
>
> . . . .
>
> (2) For any employer, labor organization, or employment agency to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part;
>
> (3) For any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so[.]

Because HRS §§ 378–2(1)(A) and 378–2(2) clearly limit liability for engaging in discriminatory conduct to an "employer," whether an individual employee—like Marxen—may be held personally liable for conduct prohibited under those sections turns on the definition of "employer."

Section § 378–1 defines an "employer" as "any person,[11] including the State or any of its political subdivisions and any agent of such person, having one or more employees, but shall not include the United States." This language is subject to two possible interpretations. Under the first interpretation, an "employer" for purposes of HRS § 378–1 includes "any person . . . having one or more employees." Under this reading, the definition of "employer" does not encompass individual employees.

A number of federal courts have adopted this reading and have concluded that the reference to "any agent of such person" in HRS § 378–1's definition of "employer" does not extend liability to individual employees under HRS §§ 378–2(1)(A) and 378–2(2). *See, e.g., White v. Pac. Media Group*, 322 F.Supp.2d 1101, 1114 (D.Haw.2004); *Maizner v. Haw. Dep't of Educ.*, 405 F.Supp.2d 1225, 1237–39 (D.Haw.2005); *Lum v. Kauai County Council*, Civ. No. 06–00068 SOM/LEK, 2007 WL 3408003, at *2–13 (D.Haw. Nov. 9, 2007), *aff'd*, 358 Fed.Appx. 860 (9th Cir.2009).

However, Lales argues that HRS §§ 378–2(1)(A) and 378–2(2) impose liability on an "employer," and that HRS § 378–1 defines an "employer" as "any person . . . having one or more employees" and "any agent of such person." Thus, Lales argues that Marxen—as an agent of JN—is considered an "employer" for purposes of HRS § 378–1, and is therefore subject to personal liability under HRS §§ 378–2(1)(A) and 378–2(2). A number of federal courts have adopted Lales's reading of HRS § 378–1 in concluding that a

---

**10.** HRS § 378–2 has since been amended in ways that are not relevant to the instant appeal. *See* 2009 Haw. Sess. Laws Act 1, § 2 at 793–95; 2011 Haw. Sess. Laws Act 34, § 4; 2011 Haw. Sess. Laws Act 206, § 2.

**11.** " 'Person' means one or more individuals, and includes, but is not limited to, partnerships, associations, or corporations, legal representatives, trustees, trustees in bankruptcy, receivers, or the State or any of its political subdivisions." HRS § 378–1.

supervisory employee, as an "agent" of his or her employer, is a statutory "employer" who may be held individually liable for his or her discriminatory conduct. *See, e.g., Black v. City & County of Honolulu,* 112 F.Supp.2d 1041, 1056–57 (D.Haw.2000); *Hale v. Publ'ns, Inc.,* 468 F.Supp.2d. 1210, 1226–29 (D.Haw.2006); *Sherez v. State of Haw. Dep't of Educ.,* 396 F.Supp.2d 1138, 1146–48 (D.Haw.2005).

We respectfully reject that interpretation of "employer" under HRS § 378–1. In our view, the legislature's inclusion of "agent" in the definition of employer did not signal an intent to impose liability on individual employees. As set forth below, the history of Hawaii's employment discrimination law and the legislature's stated purposes in enacting that law give no indication that the legislature intended to impose liability on individual employees. Instead, the legislature's use of the word "agent," "simply represented an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *Lissau v. S. Food Serv., Inc.,* 159 F.3d 177, 180 (4th Cir. 1998) (quotation marks and citations omitted) (analyzing analogous provision under Title VII of the Civil Rights Act).[12]

Because the definition of employer under HRS § 378–1 is ambiguous, this court has various tools at its disposal to determine its meaning, including: (1) examining the context with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning; (2) considering the reason and spirit of the law, and the cause which induced the legislature to enact it, in order to discover its true meaning; and (3) rejecting every construction which leads to an absurdity. *See* HRS § 1–15; *Estate of Roxas v. Marcos,* 121 Hawai'i 59, 68, 214 P.3d 598, 607 (2009).

▇ We first note that section 378–1 should not be viewed in isolation, but rather evaluated in the context of the entire statute.

*See Ah Mook Sang v. Clark,* 130 Hawai'i 282, 297, 308 P.3d 911, 926 (2013) ("[W]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." (quotation marks and citation omitted)). In this regard, elsewhere in HRS § 378–2 the legislature explicitly and unambiguously provided for employee liability, and in doing so recognized that "employers" and "employees" are distinct categories. Specifically, the legislature imposed aider-and-abettor liability on employees in HRS § 378–2(3), which makes it an unlawful discriminatory practice "[f]or any person, whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so." Thus, as the United States District Court observed in *White,* "the legislature clearly knew how to include employees within a statute's scope and its failure to do so explicitly throughout the statute suggests that employees are only held liable for infractions under HRS § 378–2(3)." 322 F.Supp.2d at 1114 (quotation marks and citation omitted).

Moreover, the history of Hawaii's employment discrimination law, and the legislature's stated purposes in enacting that law, contain no indication whatsoever that the legislature intended to impose liability on individual employees other than in HRS § 378–2(3). To the contrary, the statute appears to have been patterned on federal labor and employment discrimination laws which do not provide for individual liability.

The legislature enacted Act 180 in 1963, which made it unlawful: (1) "[f]or an employer to refuse to hire, or employ or to bar or discharge from employment, any individual," or "to discriminate against any individual in compensation or in the terms, conditions or privileges of employment" based on race, sex, age, religion, color, or ancestry (predecessor to HRS § 378–2(1)(A)); and (2) "[f]or any employer, labor organization or employment agency to discharge, expel, or otherwise dis-

---

**12.** As the Supreme Court has stated, however, "such common-law principles may not be transferable in all their particulars to Title VII." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Burling-* *ton Indus., Inc. v. Ellerth,* 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (same); *Faragher v. City of Boca Raton,* 524 U.S. 775, 791– 92, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (same).

criminate against any person because he has opposed any practice forbidden by this Act or because he has filed a complaint, testified or assisted in any proceeding respecting the employment practices and discrimination prohibited under this Act." 1963 Haw. Sess. Laws Act 180, § 1 at 223–24 (emphases added) (predecessor to HRS § 378–2(2)).

When the legislature adopted Act 180 in 1963, it did not separately define "employer." It is apparent, based on the language set forth above, that the legislature sought only to proscribe discriminatory harassment and retaliation by employers, labor organizations, and employment agencies. This interpretation is confirmed by the legislative history of the statute, which states that the purpose of the bill was to make it "unlawful for an employer to refuse to employ, to pay less wages than other employees, to discharge an employee because of, or to otherwise discriminate against a person by reason of his race, color, sex, national origin, or because such individual is between the ages of 40 to 65 years of age." H. Stand. Comm. Rep. No. 31, in 1963 House Journal, at 591 (emphasis added); *see also* H. Stand. Comm. Rep. No. 80, in 1963 House Journal, at 607 (same); S. Stand. Comm. Rep. No. 399, in 1963 Senate Journal, at 810 (same); S. Stand. Comm. Rep. No. 573, in 1963 Senate Journal, at 866. There is no indication that in proscribing harassment and retaliation by employers, the legislature also sought to address the conduct of individual employees.

In contrast, at the same time the legislature made it unlawful for employers to harass or retaliate against any individual, the legislature explicitly stated that it was unlawful for "any person whether an employer, employee or not, to aid, abet, incite, compel or coerce the doing of any of the practices forbidden by the Act, or to attempt to do so." 1963 Haw. Sess. Laws Act 180, § 1 at 224 (emphasis added) (predecessor to HRS § 378–2(3)). In other words, the legislature plainly understood how to proscribe the conduct of individual employees, and when it intended to do so, it did so explicitly and unequivocally.

The following year, the legislature included a definition of "employer," which was defined as "any person having one or more persons in his employment, [including] any person acting as an agent of an employer, directly or indirectly." 1964 Haw. Sess. Laws Act 44, § 2 at 45 (predecessor to HRS § 378–1). As relevant here, the legislative history indicates that the purpose of the bill was "to provide definitions for certain ambiguous terms used in said Act," H. Stand. Comm. Rep. No. 358, in 1964 House Journal, at 355, "in order to avoid administrative and legal difficulties." [13] H. Stand. Comm. Rep. No. 455, in 1964 House Journal, at 381. There is no indication in the legislative history, however, that by defining an employer as "any person having one or more persons in his employment, [including] any person acting as an agent of an employer," the legislature also sought to extend the coverage of the law's harassment and retaliation provisions to the acts of individual employees. Indeed such an expansive definition of "employer" would be at odds with the plain language of Act 180, which the legislature had enacted just a year earlier. 1963 Haw. Sess. Laws Act 180, § 1 at 224.

In 1981, the legislature again amended the definition of "employer" via Act 94, to read as it currently does. 1981 Haw. Sess. Laws Act 94, § 2 at 184–85. The legislature stated in the bill that its purpose in amending the definition of "employer" was "to extend coverage of Part I of [HRS chapter 378] to employees of the State and local governments[.]" *Id.*, § 1 at 184. This purpose is further explained in the legislative history, which indicates that, in 1963, the legislature had intended "to exclude the State and its political subdivisions from the definition of 'employer' and instead to provide government workers with protection against employment discrimination under a separate law." H. Stand. Comm. Rep. No. 549, in 1981 House Journal, at 1166. Because the legislature never adopted such legislation, the legislature sought to "[provide] the same protection against discrimination under State law [ ], to public employees as is already provided to employees in the private sector."

---

**13.** In defining "employer," the legislature intentionally excluded the state and its political subdi-

visions. S. Stand. Comm. Rep. No. 442, in 1964 Senate Journal, at 504–05.

*Id.; see also* S. Stand. Comm. Rep. No. 653, in 1981 Senate Journal, at 1195; S. Stand. Comm. Rep. No. 1109, in 1981 Senate Journal, at 1363.

 Based on this history of the definition of "employer" under HRS § 378–1, and the legislature's express proscription of individual employee conduct under the aider-and-abettor provision in HRS § 378–2(3), we conclude that in using the term "agent," the legislature did nothing more than ensure that employers would be liable for the discriminatory conduct of their agents. Federal cases interpreting Title VII of the Civil Rights Act of 1964 support this conclusion. As this court has noted, "the federal courts' interpretation of Title VII is useful in construing Hawaii's employment discrimination law." *Sam Teague, Ltd. v. Haw. Civil Rights Comm'n,* 89 Hawai'i 269, 281, 971 P.2d 1104, 1116 (1999). "The federal courts have considerable experience in analyzing these cases, and we look to their decisions for guidance." *Furukawa v. Honolulu Zoological Soc.,* 85 Hawai'i 7, 13, 936 P.2d 643, 649 (1997).

The federal courts' interpretation of the definition of "employer" under Title VII is relevant here because that definition is substantially similar to the definition set forth in HRS § 378–1. Specifically, 42 U.S.C. § 2000e, defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include [ ] the United States[.]" 42 U.S.C. § 2000e (emphasis added).

Federal court cases interpreting Title VII are also instructive here because both Title VII and the legislature's original definition of employer were adopted in the same year—1964—and each definition of "employer" was substantially similar to the definition of "employer" under the National Labor Relations Act (NLRA). *See* 29 U.S.C. § 152(2). Indeed, the definitional provisions of Title VII were patterned on those in the NLRA. *See, e.g., Meritor,* 477 U.S. at 75 n. 1, 106 S.Ct. 2399 (Marshall, J., concurring) ("The remedial provisions of Title VII were largely modeled on those of the [NLRA]."); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (noting that the backpay provision of Title VII "was expressly modeled on the backpay provision of the [NLRA]"); *Low v. Hasbro, Inc.,* 817 F.Supp. 249, 250 (D.R.I.1993) (noting that Title VII's definitional provisions were "based on the language of the National Labor Relations Act"). Since 1947, the NLRA has provided that "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly[.]" 29 U.S.C. § 152(2). Under the NLRA "corporate officers have not been held personally accountable for the corporation's backpay liability absent circumstances equivalent to those that would justify piercing the corporate veil at common law." *See, e.g., Donovan v. Agnew,* 712 F.2d 1509, 1512 (1st Cir.1983) (citations omitted).

As relevant here, every federal court of appeals to consider the issue has concluded that the inclusion of "agent" in the definition of "employer" under Title VII "simply represented an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *See Lissau,* 159 F.3d at 180–81 (internal quotation marks omitted) (citing cases from the second, third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and D.C. circuits reaching the same conclusion). Given the substantially similar definitions of "employer" under Title VII and HRS § 378–1, we agree with these courts that by including the term "and any agent of such person" in the definition of "employer," the legislature sought only to impose liability on employers for the discriminatory conduct of their agents.

Of course, we recognize that "federal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail." *Furukawa,* 85 Hawai'i at 13, 936 P.2d at 649. Here, however, HRS chapter 378 and Title VII do not differ in relevant detail. Although HRS chapter 378 reaches a broader range of employers than Title VII, because HRS § 378–1 defines an employer

as "any person ... having one or more employees," whereas 42 U.S.C. § 2000e defines an employer as "a person ... who has fifteen or more employees," the fact that the legislature sought to reach employers with as few as one employee does not demonstrate that the legislature also sought to impose personal liability on individual employees as "employers" under HRS §§ 378–2(1)(A) and 378–2(2). To the contrary, in crafting HRS chapter 378 it is clear that the legislature knew how to proscribe the conduct of individual employees and did so expressly when that was its intent. As noted above, HRS § 378–2(3) makes it unlawful for an employee to aid, abet, incite, compel, or coerce any discriminatory practice. The inclusion of this subsection supports the conclusion that the legislature did not intend to impose personal liability on individual employees as "employers" under HRS §§ 378–2(1)(A) and 378–2(2).

Nevertheless, Lales cites to several cases decided by this court, which he asserts support a conclusion that individual employees may be held liable under HRS §§ 378–2(1)(A) and 378–2(2). However, this court has never squarely addressed the issue of whether an individual employee is an "employer" under those sections. For example, in *Steinberg v. Hoshijo*, 88 Hawai'i 10, 960 P.2d 1218 (1998), a female complainant, Linda Louise Gould, filed a sexual harassment claim, under HRS § 378–2(1)(A), with the Hawai'i Civil Rights Commission (HCRC) against her former employer, Kailua Family and Urgent Medical Care (Clinic), and her former supervisor, Dr. Harold Steinberg. Gould alleged that during her employment with the Clinic, Dr. Steinberg subjected her to unwelcome sexual conduct. *Id.* at 12, 960 P.2d at 1220. The Clinic subsequently settled the claims against it, and was dismissed from the case. *Id.* at 14, 960 P.2d at 1222. The HCRC proceeded with the claim against Dr. Steinberg and found him liable for sexual harassment. *Id.* at 11, 960 P.2d at 1219. The circuit court affirmed the HCRC's decision against Dr. Steinberg, and Dr. Steinberg appealed to this court. *Id.* at 15, 960 P.2d at 1223. On appeal, this court affirmed the circuit court's order. *Id.* at 19, 960 P.2d at 1227. This court, however, did not consider

the issue presented in this case, expressly noting that "[t]he parties [did] not dispute that Dr. Steinberg was an agent of the Clinic and therefore an 'employer' as defined by HRS § 378–1." *Id.* at 18 n. 10, 960 P.2d at 1226 n. 10.

In *Sam Teague*, 89 Hawai'i 269, 971 P.2d 1104, a female complainant, Yvette Shaw, filed a claim under HRS § 378–2(1)(A) with the HCRC, alleging discrimination because of her sex. Shaw's claim named both Sam Teague, Ltd., and its president and sole stockholder Sam Teague, and this court referred to both, collectively, as "Employer." After a contested case hearing, the HCRC affirmed the hearings officer's findings and conclusions, finding that Employer had engaged in discriminatory practices. *Id.* at 274, 971 P.2d at 1109. The circuit court affirmed the HCRC's decision and Employer appealed. *Id.* at 274–75, 971 P.2d at 1109–10. Although this court noted that the HCRC had added Teague, in her personal capacity, to the complaint "[b]ecause HRS § 378–1 [ ] defines 'employer' to include agents of persons having one or more employees," this court was not confronted with the correctness of the HCRC's determination in this regard. *Id.* at 276–77, 971 P.2d at 1111–12. Moreover, it is unclear what impact the fact that Teague was the president and sole shareholder of the two-person business, Sam Teague, Ltd., had on the HCRC's conclusion that Teague was an "employer" under HRS § 378–1.

Lastly, in *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 32 P.3d 52 (2001), an employee, Charles Schefke, brought an action against his employer and its owners. Schefke alleged, among other things, age discrimination claims under HRS §§ 378–2(1)(A), 378–2(2), and 378–2(3). *Id.* at 417, 32 P.3d at 61. As relevant here, the circuit court granted the owners' motion for a directed verdict as to their individual liability. *Id.* at 419, 32 P.3d at 63. In concluding that the circuit court erred in granting directed verdicts in favor of the owners, however, it is not clear whether this court was addressing their individual liability under HRS §§ 378–2(1) and (2), or under HRS § 378–2(3). *Id.* at 442, 32 P.3d at 86. More-

over, *Schefke* involved discrimination claims against an employer and its owners, and not an individual employee, as is the case here. *Id.* at 415, 32 P.3d at 59. Accordingly, our holding that an individual employee is not liable as an "employer" under HRS §§ 378–2(1)(A) and 378–2(2) does not conflict with our precedent.

◼ Finally, we note that generally, in the case of ambiguous statutory language, "an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous." *Gillan v. Gov't Employees Ins. Co.*, 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008). Here, the HCRC has interpreted the definition of "employer" under HRS § 378–1 to include supervisory employees. *See generally Santos v. Niimi*, No. 92–001–E–SH (HCRC Nov. 4, 1992) (Hearing Examiner's Findings of Fact, Conclusions of Law and Recommended Order), *adopted by* (HCRC Jan. 25, 1993) (Final Decision and Order); *Tseu v. Cederquist, Inc.*, No. 95–001–E–R–S (HCRC Mar.13, 1996) (Hearings Examiner's Findings of Fact, Conclusions of Law and Recommended Order), *adopted by* (HCRC June 28, 1996) (Final Decision and Order); all available at http://labor.hawaii.gov/hcrc/contested-case-decisions/. However, for the reasons set forth above, the HCRC's construction of HRS § 378–1 is palpably erroneous. The first HCRC decision on this issue, *Santos*, relied on early federal court cases interpreting Title VII that held the statute provided for individual liability. *See, e.g., Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *vacated on other grounds*, 900 F.2d 27 (4th Cir.1990); *Hendrix v. Fleming Cos.*, 650 F.Supp. 301, 302–03 (W.D.Okla. 1986); *Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 580 F.Supp. 662, 668–69 (D.D.C.1984); *Watson v. Sears, Roebuck Co.*, 742 F.Supp. 353, 357 (M.D.La. 1990). However, as noted above, these cases have subsequently been overwhelmingly rejected by the federal courts of appeals, including the circuits in which those cases arose. *See, e.g., Lissau*, 159 F.3d at 180 (Fourth Circuit notes that "[a]n analysis of Title VII's language and its remedial scheme

leads us to join the other circuit courts and conclude that supervisors are not liable in their individual capacities for Title VII violations."); *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir.1996) ("[W]e agree with the majority view that, taken as a whole, the language and structure of amended Title VII continue to reflect the legislative judgment that statutory liability is appropriately borne by employers, not individual supervisors."); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir. 1995) ("[W]hile a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII."); *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.1994) ("[W]e conclude that individuals who do not otherwise qualify as an employer cannot be held liable for a breach of title VII."). Moreover, since its inception in 1963, Hawaii's employment discrimination law has proscribed individual employee conduct only to the extent that the employee aids, abets, incites, compels, or coerces discriminatory conduct. HRS § 378–2(3). As explained above, there is no indication that the legislature also sought to extend liability to individual employees for harassment and retaliation claims under HRS §§ 378–2(1)(A) and 378–2(2), respectively.

In sum, the legislature's inclusion of "agent" in the definition of "employer" under HRS § 378–1 did not signal an intent to impose liability on individual employees. Instead, by using the term "agent," the legislature did nothing more than ensure that employers would be liable for the discriminatory conduct of their agents. We therefore hold that Marxen was not subject to personal liability under HRS §§ 378–2(1)(A) and 378–2(2) for Lales's state harassment and retaliation claims.

**B. The circuit court erred in granting summary judgment in favor of JN on the state and federal harassment claims (COA 1 and 5)**

The Defendants contend that the circuit court did not err in granting summary judgment in favor of JN on the state and federal

harassment claims (COA 1 and 5). With regard to both the state and federal harassment claims against JN, the Defendants argue that the ICA misconstrued the Supreme Court's decision in *Faragher*. In regard to the federal harassment claim, Lales argues that the *Faragher* affirmative defense is not available in this case because there was tangible employment action taken against him, i.e., he was terminated. In regard to the state harassment claim, Lales argues that HAR § 12–46–175(d) imposes strict liability on employers for actions of their supervisory employees, thus precluding application of the *Faragher* affirmative defense under Hawai'i law. In reply, Defendants argue that the HCRC overstepped its statutory authority in enacting HAR § 12–46–175(d), and thus, this court should follow federal precedent and recognize the *Faragher* affirmative defense.

As discussed below, the Court's decision in *Faragher*, while applicable to federal harassment claims, is not presently implicated in this case because there remains a question of material fact as to whether JN's alleged discriminatory actions culminated in Lales's termination. Moreover, the *Faragher* affirmative defense is not applicable to Hawai'i's anti-discrimination laws because the administrative rules impose strict liability on employers for harassment on the basis of ancestry by their agents and supervisory employees, and the HCRC acted within the scope of its administrative authority in enacting those rules.

### 1. *Faragher* Affirmative Defense

In *Faragher*, the plaintiff, Beth Ann Faragher, filed an employment discrimination claim, pursuant to Title VII of the Civil Rights Act of 1964, against her employer, the Parks and Recreation Department of the City of Boca Raton (City), and her immediate supervisors Bill Terry, David Silverman, and Robert Gordon. 524 U.S. at 780–81, 118 S.Ct. 2275. Faragher alleged that the City and her immediate supervisors created a "sexually hostile atmosphere" at work by subjecting her to, among other things, "uninvited and offensive touching." *Id.* The district court determined, in relevant part, that

the City could be held liable for the harassment by its supervisory employees:

First, the court noted that the harassment was pervasive enough to support an inference that the City had "knowledge, or constructive knowledge," of it. Next, it ruled that the City was liable under traditional agency principles because Terry and Silverman were acting as its agents when they committed the harassing acts. Finally, the court observed that Gordon's knowledge of the harassment, combined with his inaction, "provides a further basis for imputing liability on [sic] the City."

*Id.* at 783 (citations omitted).

On appeal to the Eleventh Circuit Court of Appeals, a three-judge panel reversed the judgment against the City on the ground that it was not appropriate to hold the City liable for the supervisors' conduct. *Id.* The Eleventh Circuit, sitting en banc, adopted the panel's conclusion. *Id.*

The United States Supreme Court granted certiorari and determined that it was appropriate to hold an employer vicariously liable for wrongful conduct of a supervisor when that supervisor is using his or her supervisory authority. *Id.* at 786, 118 S.Ct. 2275. However, the Court determined that imposing liability based on the misuse of supervisory authority conflicted with its prior ruling that an employer was not "automatically" liable for harassment by a supervisor. *Id.* at 804, 118 S.Ct. 2275 (citing *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399). The Court, therefore, identified the circumstances under which an employer could be held vicariously liable under Title VII for the actions of its supervisory employees:

In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 [118 S.Ct. 2257, 141 L.Ed.2d 633] (1998), also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immedi-

ate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *See Burlington,* 524 U.S.[ ] at 762–63 [118 S.Ct. 2257].

*Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275.

In sum, the Court determined that when no tangible employment action is taken against an employee, an employer can assert an affirmative defense against a claim of discrimination by one of its supervisors.[14]

However, the Court held that an employer would be held strictly liable for the discriminatory conduct of its supervisors if that conduct resulted in tangible employment action against the employee.

2. **Summary judgment was not appropriate on Lales's federal harassment claim against JN because there remains an issue of material fact as to whether the alleged harassment culminated in Lales's discharge**

■ It is undisputed that the *Faragher* affirmative defense applies to federal harassment claims. In their application, the Defendants argue that the ICA "ignored the substantial body of federal case law that permits the *Faragher* affirmative defense even if there [was] tangible employment action." *See, e.g., Ferraro v. Kellwood Co.,* 440 F.3d 96, 102 (2d Cir.2006) ("The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment. This reading comports with the purpose of the test—to determine whether 'the supervisor's misconduct has been aided by the agency relation.' If an official action taken by a supervisor is not part of his discriminatory harassment, it provides no evidence that the supervisor used his agency relation with the employer to further his misconduct."). Specifically, Defendants assert that there was no evidence that the alleged harassment "culminated" in Lales's discharge.

Contrary to Defendants' assertion, summary judgment based on the *Faragher* defense was not appropriate in this case because there existed issues of material fact as to whether the alleged harassment by Marxen against Lales indeed culminated in Lales's discharge.[15] *See, e.g., Bennett v. Progressive*

14. The United States Supreme Court recently held that, for purposes of holding an employer vicariously liable under Title VII, an employee must show that the alleged discrimination was committed by a "supervisor," which the Court defined as an employee "empowered by the employer to take tangible employment actions against the victim[.]" *Vance v. Ball State Univ.,* —— U.S. ——, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013). In this case, it is undisputed that Marxen was a "supervisor" insomuch as he had the authority to hire, reassign, and terminate

Lales. Accordingly, the Court's decision in *Vance* does not affect our holding.

15. *Ferraro* is not inconsistent with this determination. In *Ferraro,* Laura Ferraro brought a discrimination claim against her employer under the New York State Human Rights Law and New York City Human Rights Law. 440 F.3d at 98. The United States Court of Appeals for the Second Circuit noted that Ferraro did not dispute the availability of the *Faragher* affirmative defense, and determined that the employer satisfied

352

*Corp.*, 225 F.Supp.2d 190, 204 (N.D.N.Y. 2002); *EEOC v. Safelite Glass Corp.*, No. 4:10–CV–102–F, 2012 WL 3266333, at *12–*13 (E.D.N.C. Aug. 9, 2012) (holding that there were still genuine issues of material fact as to whether the harassment "culminated" in the employee's termination).

In *Bennett*, a federal district court analyzed whether to grant employer Progressive Corporation's motion for summary judgment on a Title VII sexual harassment claim brought by a former employee, Janet Bennett. 225 F.Supp.2d at 204. Bennett alleged that her supervisor, Larry Mitchell, made unwelcome comments about her and tried to have a sexual relationship with her. *Id.* at 197. Mitchell allegedly increased Bennett's workload when Bennett refused his sexual advances, and forced Bennett to drink alcohol while at work or on the job in an attempt to get Bennett to have a physical relationship with him. *Id.* at 198–99. Bennett did not report Mitchell's actions until nearly a year later, when she reported Mitchell's conduct to Michael Beney, Mitchell's supervisor and personal friend. *Id.* at 197–200. Beney subsequently terminated Bennett and Mitchell for consumption of alcohol on the job, which was against company policy. *Id.* at 202. Bennett filed a discrimination and retaliation lawsuit against Progressive, and Progressive filed a motion for summary judgment arguing that it was not liable under Title VII because it satisfied the affirmative defense set forth in *Faragher*. *Id.* at 196, 202–10.

The federal district court analyzed, inter alia, whether the sexual harassment culminated in Bennett's termination, and determined:

> In the instant case, factual questions remain as to the true reason for plaintiff's termination. She alleges that the hostile work environment Mitchell created coerced her, against her will, into drinking, and that such drinking was used as the reason for her termination. She alleges that the real reason she was fired was not due to a violation of the office alcohol policy, but rather because she lodged a

complaint against Mitchell to Beney, and the company used her violation of the alcohol policy as a convenient means to head off any problems arising from the sexual harassment complaint lodged against Mitchell. Plaintiff alleges, and Mitchell does not deny, that Beney was friends with Mitchell and his wife, citing, among other things, Beney's participation as an usher in Mitchell's wedding. As such, sufficient factual disputes have been raised as to whether or not the termination, in the end, was a culmination, or result, of Mitchell's harassment.

*Id.* 204–205.

Accordingly, the court denied summary judgment in light of its holding that there were genuine issues of material fact as to Bennett's harassment claim under Title VII. *Id.* at 219.

Similarly, in the present case, Lales presented sufficient evidence to raise an issue of material fact as to whether the alleged discriminatory conduct "culminate[d] in tangible employment action" against Lales. For example, in his declaration, Lales stated that he was subjected by Marxen to derogatory remarks and slurs, such as being called "Frenchie," "fucking French Bastard," and being told by Marxen that he could not participate in a radio program where salespersons were allowed to get on the radio and announce "slasher sales" of vehicles because Marxen "did not want [Lales's] French accent on the radio to sell American cars." Furthermore, Lales stated in his declaration that Marxen told him to call himself "Frenchy" and to put that name on his business card. Lales stated that he did not put "Frenchy" on his business card because he found this to be offensive. One month prior to his termination, Lales reported Martinez's discriminatory behavior to Marxen, and Marxen responded, "You Fucking French Bastard, get out of my office[.]" Lales said in his declaration that the initial reason given for his termination on June 23, 2002, was poor sales performance and missing a meeting. Upon confronting Marxen about JN's rationale for his termi-

its summary judgment burden to show that any alleged discriminatory conduct did not culminate

in Ferraro's termination. *Id.* at 99–100, 102.

nation, Marxen reinstated Lales. The next day, June 24, 2002, Lales was again terminated, this time for allegedly lying to a customer. The initial June 23, 2002 Termination Report was re-dated to reflect the new termination date, June 24, 2002. Furthermore, in addition to the original reason for Lales's termination, the re-dated June 24, 2002 Termination Report stated that Lales lied to customers and the used car manager.

The instant case is analytically similar to *Bennett.* Defendants argue that Lales was terminated because he lied to customers. In contrast, Lales's evidence is sufficient to raise the inference that Lales was subjected to a course of discriminatory conduct by Marxen that culminated in Lales's discharge, with the alleged lie to the customers serving as a "convenient means" for Lales's termination. *Id.* at 204–04. That conduct allegedly began with Marxen's use of derogatory remarks toward Lales, then continued with Marxen's alleged rejection of Lales's complaint to him approximately one month before Lales's termination (which was itself allegedly accompanied by another such remark), and culminated with Lales's termination only one day after an aborted attempt by Marxen to terminate him for missing a sales meeting and poor sales performance. These alleged circumstances are sufficient to raise the inference that Marxen utilized his authority as a supervisor to further his alleged discriminatory animus toward Lales by terminating him after he complained—a situation to which the *Faragher* defense would not apply. *Cf. Ferraro,* 440 F.3d at 102 ("If an official action taken by a supervisor is not part of his discriminatory harassment, it provides no evidence that the supervisor used his agency relation with the employer to further his misconduct.").

Because there is an issue of material fact as to whether Marxen's harassment culminated in Lales's discharge, the circuit court erred in granting summary judgment in fa-

vor of JN on the federal harassment claim (COA 5).[16]

3. **Summary judgment was not appropriate on Lales's state harassment claim against JN because HAR § 12–46–175(d) imposes strict liability on an employer for the discriminatory conduct of its supervisory employees**

█ Lales argues that the *Faragher* affirmative defense is not applicable to the state harassment claim because HAR § 12–46–175(d) imposes strict liability on employers for actions of their supervisory employees. Defendants, however, argue that the HCRC overstepped its statutory authority in enacting HAR § 12–46–175(d), and thus, the *Faragher* affirmative defense should be adopted.

As explained below, HAR § 12–46–175(d) does not contradict or conflict with HRS chapter 378, and the HCRC did not overstep its statutory authority in imposing strict liability on employers for the discriminatory actions of their supervisors. Therefore, the *Faragher* affirmative defense is not applicable to the state harassment claim.

Pursuant to statutory authority, *see* HRS § 368–3(9) (Supp.2002) (noting that the HCRC has the authority to "adopt rules under chapter 91"), the HCRC adopted HAR § 12–46–175, which provides, in relevant part:

(d) An employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of ancestry regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The [HCRC] will examine the circumstances of the particular employment

---

**16.** The ICA determined, "Here, because the alleged harassment by Marxen did culminate in Lales's discharge, the *Faragher* affirmative defense did not apply." *Lales,* 2012 WL 1624013, at *15. To the extent this statement appears to resolve a factual dispute, it would not be proper in reviewing a motion for summary judgment. *See Rodriguez v. Nishiki,* 65 Haw. 430, 439, 653

P.2d 1145, 1151 (1982) ("It is not within the province of the trial court at summary judgment to resolve factual disputes."). Nevertheless, the ICA did not err in vacating the circuit court's grant of summary judgment on the harassment claims (COAs 1 and 5) because Lales provided sufficient evidence to raise a genuine issue of material fact.

relationship and the job functions performed by the individual in determining whether an individual acts in a supervisory or agency capacity.

(e) With respect to conduct between fellow employees, an employer shall be responsible for acts of harassment in the workplace on the basis of ancestry, where the employer, its agent, or supervisory employee, knows or should have known of the conduct, unless the employer can show that it took immediate and appropriate corrective action.

(Emphasis added).

HAR § 12–46–175 provides the requirements for an ancestry harassment claim, and specifically distinguishes between supervisory liability and co-worker liability. *See* HAR §§ 12–46–175(d) and (e). On one hand, HAR § 12–46–175(d) imposes strict liability on employers for actions of their supervisory employees for ancestry harassment, regardless of whether the acts were forbidden or whether the employer knew about this conduct. On the other hand, HAR § 12–46–175(e) imposes liability for conduct between fellow employees only if the employer, its agents, or supervisory employees knew or should have known of the harassment.

▇▇▇▇ "It is axiomatic that an administrative rule cannot contradict or conflict with the statute it attempts to implement." *Agsalud v. Blalack*, 67 Haw. 588, 591, 699 P.2d 17, 19 (1985) (citations omitted). Furthermore, an agency's authority to promulgate rules "is limited to enacting rules which carry out and further the purposes of the legislation and do not enlarge, alter, or restrict the provisions of the act being administered." *Puana v. Sunn*, 69 Haw. 187, 189, 737 P.2d 867, 870 (1987). Here, there are no statutory provisions that preclude the HCRC from imposing strict liability on an employer for the actions of its supervisory employees. To the contrary, and as explained further infra, the statutory language provides the HCRC with broad rulemaking authority that authorized the promulgation of the rule at issue here.

From its inception, the HCRC was given broad authority to create rules to enforce the State's anti-discrimination laws. In 1988, the legislature enacted the Hawai'i Civil Rights Act. 1988 Haw. Sess. Laws Act 219, § 1 at 387. The intent of the Hawai'i Civil Rights Act was to "preserve all existing rights and remedies" of the various state anti-discrimination laws,[17] and to "provide a mechanism which provides for a uniform procedure for the enforcement of the State's discrimination laws." 1988 Haw. Sess. Laws Act 219, § 1 at 387 (emphasis added); HRS § 368–1. To effectuate this intent, the legislature created the HCRC. The powers and functions of the HCRC include "adopt[ing] rules under chapter 91." HRS § 368–3.

In addition, the legislature provided the HCRC with broad discretion to order remedies for violations of the anti-discrimination laws, including: "[h]iring, reinstatement, or upgrading of employees with or without back pay[,]" HRS § 368–17(a)(1) (Supp.2002), requiring "[r]eporting as to the manner of compliance[,]" HRS § 368–17(a)(6) (Supp.2002), and ordering "[o]ther relief the commission or the court deem[ed] appropriate." HRS § 368–17(a)(10) (Supp.2002).

Thus, the legislature granted the HCRC broad authority to promulgate and enforce rules that effectuate the State's anti-discrimination laws.[18] Indeed, this court has held,

an administrative agency can only wield powers expressly or implicitly granted to it by statute. However, it is well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers

---

**17.** At the time, the State's Department of Labor and Industrial Relations was the entity tasked with enforcing Hawai'i's anti-discrimination laws. Under the department's administrative regulations at the time, employers were held strictly liable for the actions of their supervisory employees. *See* HAR § 12–23–115(d) (1986).

**18.** The HCRC's authority to promulgate rules is not without restrictions. Indeed, this court has stated that the HCRC exceeded its statutory authority in promulgating a regulation that allowed its executive director or any interested person to petition the commission for a declaratory ruling because that rule conflicted with a statutory provision. *RGIS Inventory Specialist v. Haw. Civil Rights Comm'n*, 104 Hawai'i 158, 161, 86 P.3d 449, 452 (2004).

expressly granted. The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency.

*Haole v. State,* 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006) (citation omitted).

The HCRC rules implicated in this case were "reasonably necessary" in interpreting the statute. For example, the legislature did not define the extent of an employer's liability or provide any defenses for discriminatory conduct. To "carry out" its power of providing a "uniform procedure for the enforcement of the State's discrimination laws[,]" HRS § 368–1, it was "reasonably necessary" for the HCRC to clarify these gaps left in the statute. *Haole,* 111 Hawai'i at 152, 140 P.3d at 385.

With regard to HAR §§ 12–46–175(d) and (e), the HCRC clarified the extent to which an employer could be held liable for the actions of its employees, by providing that an employer could be strictly liable for the discriminatory conduct of its supervisory employees. It was within the HCRC's power to distinguish between supervisory employees and co-workers, *Haole,* 111 Hawai'i at 152, 140 P.3d at 385, and in so doing, the HCRC furthered the purpose of Hawai'i's anti-discrimination statute. For the same reasons, these rules do not "enlarge, alter, or restrict" the provisions of HRS § 378–2. Again, the HCRC's rules merely interpreted the statute to effectuate the legislative purpose.[19] *See Puana,* 69 Haw. at 189, 737 P.2d at 870.

Because the HCRC is tasked with enforcing the mandates of HRS § 378–2, and the extent of an employer's liability for the conduct of supervisors and co-workers is not defined by statute, the HCRC's interpretation should be given deference. *See Gillan,* 119 Hawai'i at 114, 194 P.3d at 1076 ("[I]n the case of … ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous."); *In re Water Use Permit Applications,* 94 Hawai'i 97, 144, 9 P.3d 409, 456 (2000) ("[W]here an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." (citation omitted)). It is not "palpably erroneous" for the HCRC to interpret HRS § 378–2 to impose strict liability on employers for the discriminatory conduct of its supervisors. *See, e.g., Meritor,* 477 U.S. at 76–77, 106 S.Ct. 2399 (Marshall, J., concurring) ("[I]t is the authority vested in the supervisor by the employer that enables him to commit the wrong: it is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.").

---

**19.** The dissenting opinion relies on the Restatement (Second) of Agency § 219 (1958) to conclude that HAR § 12–46–175(d) exceeds the scope of the HCRC's authority. Dissenting opinion at 375–79, 328 P.3d at 384–88. Respectfully, however, HAR § 12–46–175(d) is consistent with the theory of agency set forth in the Second Restatement. As the dissenting opinion notes, *see* dissenting opinion at 377–78, 328 P.3d at 386–87, § 219(d) subjects an employer to liability for the conduct of a supervisory employee where, inter alia, that employee was "aided in accomplishing the tort by the existence of the agency relation." Similarly, HAR § 12–46–175(d) provides that the HCRC "will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in a supervisory or agency capacity." In other words, by its express terms, HAR § 12–46–

175(d) provides that the HCRC must determine whether the supervisory employee was "aided … by the existence of the agency relation" before strict liability will be imposed, and does not, as the dissenting opinion suggests, "render[] employers liable for the tortious actions of their employees that may not have been aided by the supervisory status of the offending employees." Dissenting opinion at 379, 328 P.3d at 388.

Thus, under the plain language of the rule, the liability of employers for the acts of supervisors is not limitless. For example, where "a supervisor has no authority over an employee, because the two work in wholly different parts of the employer's business, it may be improper to find strict employer liability." *Meritor,* 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring). The last sentence of HAR § 12–46–175(d) appropriately accounts for such a situation.

Moreover, HRS § 368–1 provides that the intent of the Hawaiʻi Civil Rights Act, and its creation of the HCRC, was to "preserve all existing rights and remedies" of the various state anti-discrimination laws. 1988 Haw. Sess. Laws Act 219, § 1 at 387 (emphasis added); HRS § 368–1 (emphasis added). In this regard, prior to the creation of the HCRC, the administrative rules of the Department of Labor and Industrial Relations—the agency formerly tasked with enforcing Hawaiʻi's anti-discrimination laws—held employers strictly liable for the discriminatory actions of their supervisory employees.

HAR § 12–23–115(d) (1986) provided:

An employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of ancestry regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The department will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in a supervisory or agency capacity.

The current language of HAR § 12–46–175(d), which the HCRC adopted in 1990, is nearly identical to the language of HAR § 12–23–115(d),[20] which existed prior to the creation of the HCRC. When the legislature created the HCRC in 1988, it did not expressly preclude the HCRC from imposing strict liability on employers for the actions of their supervisory employees, as was already authorized under the existing administrative rules of the Department of Labor and Industrial Relations. Given that one of the purposes of creating the HCRC was to "preserve all existing rights and remedies," and

that the legislature did not expressly foreclose the HCRC from adopting the then existing anti-discrimination rights and remedies, the HCRC did not violate its statutory mandate in adopting HAR § 12–46–175(d).

In sum, HAR § 12–46–175(d) imposes strict liability on employers for the discriminatory conduct of their supervisory employees, and thus, the *Faragher* affirmative defense is not applicable to HRS chapter 378.[21] Accordingly, the circuit court erred in granting summary judgment in favor of JN on Lales's state harassment claim.

**C. There were genuine issues of material fact regarding whether JN's proffered reasons for Lales's termination were pretextual (COAs 2 and 6)**

In *Schefke*, this court adopted a tripartite burden-shifting test for retaliation claims under HRS § 378–2(2):

(1) the plaintiff must first establish a prima facie case of such retaliation by demonstrating that (a) the plaintiff (i) "has opposed any practice forbidden by HRS chapter 378, Employment Practices, Part I, Discriminatory Practices or (ii) has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part," (b) his or her "employer, labor organization, or employment agency has . . . discharged, expelled, or otherwise discriminated against the plaintiff," and (c) "a causal link has existed between the protected activity and the adverse action;" (2) if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that

---

20. The only difference between the two regulations is the reference to the "department" in HAR § 12–23–115(d) and "commission" in HAR § 12–46–175(d).

21. Contrary to the dissent's suggestion, HAR § 12–46–175(d) indeed allows the HCRC to conduct a case-by-case determination of whether the acts of a supervisor subject the employer to lia-

bility. *See* dissenting opinion at 378–79, 328 P.3d at 387–88. As noted above, the HCRC is required to examine the "circumstances" of the employment relationship to determine whether the individual acts in a supervisory or agency capacity. HAR § 12–46–175(d). An examination of the "circumstances" necessitates analyzing whether the acts of the supervisor appropriately subject the employer to liability.

the reason given by the defendant is pretextual.

96 Hawai'i at 426, 32 P.3d at 70 (brackets and citations omitted).

Similarly, this court described the burden shifting test for retaliation claims brought under Title VII:

Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 to 2000e–17 (1994), ... federal courts have held that, in a prima facie case of retaliation, an employee must show that (1) he or she engaged in a protected activity; (2) his or her employer subjected him or her to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.

Schefke, 96 Hawai'i at 425, 32 P.3d at 69 (brackets and citations omitted).

██ Defendants argue that Lales did not submit sufficient evidence regarding his state and federal retaliation claims to create a genuine issue of material fact as to whether JN's reason for his firing was pretextual. As discussed further below, Defendants' argument is without merit.

Because it is not now disputed that Lales established a prima facie case of retaliation, the burden shifted to JN to provide a legitimate nondiscriminatory reason for Lales's termination. Schefke, 96 Hawai'i at 426, 32 P.3d at 70. Defendants argued that JN's legitimate nondiscriminatory reason for terminating Lales was that Lales lied to custom-

ers when telling them that there was air conditioning in a truck that he sold to them. See Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("[T]he employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.' "). Lales asserts that this reason was pretextual.

Although Defendants presented evidence that contradicted Lales's evidence, Lales's evidence created genuine issues of material fact regarding whether JN's reasons for Lales's termination were pretextual. In his declaration attached to his opposition to JN's motion for summary judgment, Lales stated that he was subjected to derogatory comments about his ancestry and national origin at JN. Lales further asserted that approximately one month before his termination, Lales orally complained to Marxen about the discrimination, and Marxen responded, "You Fucking French Bastard, get out of my office[.]" One month later, on June 23, 2002, Marxen initially told Lales that he was terminated for not selling enough cars and for missing a meeting.[22] Lales met with Marxen and questioned the rationale for his termination, stating that he had not been notified of the meeting and that other employees had lower sales than he did. Marxen then changed his mind and allowed Lales to continue to work the next day. The next day, however, Lales was terminated for allegedly lying to his customers about air conditioning in the truck he sold them. Lales explicitly denied telling the customers that the truck had air conditioning.[23]

When considering the evidence in the light most favorable to Lales, see First Ins., 126 Hawai'i at 413–14, 271 P.3d at 1172–73, there are genuine issues of material fact as to the whether the reasons for Lales's termination

22. Marxen explained that JN regularly uses termination letters to motivate its employees: "A lot of times, our terminations are idle threats. A lot of times, they're geared to—they're used to motive [sic] the people to get them to go back to work, and laying around and coming in late, that type of thing, which I'm not saying that's the case with [ ] Lales."

23. Although the ICA appeared to rely on Lales's statements that other employees at JN Automo-

tive told the customers that the car had air conditioning, and those employees were not fired, **[ROA vol. 11 at 170]** these statements appear to be inadmissible hearsay, Hawai'i Rules of Evidence Rule 802, and accordingly, it appears that the ICA erred in considering these statements. However, any such error was harmless because there was still sufficient evidence to raise an issue of material fact as to whether JN's rationale for Lales's termination was pretextual.

were pretextual. In *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089, the United States Supreme Court stated that a plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See also Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 379, 14 P.3d 1049, 1060 (2000) (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). In this case, Lales's declaration offers sufficient evidence to raise an issue of fact about whether his termination was pretext for a discriminatory motive, specifically, because of (1) Marxen's allegedly hostile reaction to Lales's oral complaint, (2) the temporal proximity (amount one month) between the complaint and the termination, and (3) the aborted attempt to fire him on the previous day, which, given the surrounding circumstances suggested by Lales's declaration, raises an inference of retaliatory intent.

Citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054 (9th Cir.2002), Defendants argue that "the ICA incorrectly accepted that the relevant issue was whether [Lales] had, in fact, lied to the customers, rather than if the reason for terminating [Lales] was false. Whether [Lales] lied or not is not material—the question is whether [Defendants] believed that [Lales] had lied." However, *Villiarimo* is distinguishable from the present case. There, the employee, Reloynne Villiarimo, was a ramp supervisor for Aloha Island Air. *Id.* at 1058. The airline insisted that it terminated Villiarimo because she violated a rule in connection with an accident that resulted in damage to one of the airline's airplanes, and she had been dishonest during the investigation of the accident. *Id.* Villiarimo did not dispute that she failed to perform her job satisfactorily, which resulted in damage to the airplane. *Id.* at 1062 n. 8. However, Villiarimo maintained that she was terminated because of her sex and that the reasons offered by the airline for her termination were pretextual. *Id.* at 1061–63. Villiarimo specifically argued that the airline's reason for her termination changed over time, that three of the airline's witnesses were not credible, and that a state agency had already determined, in the con-

text of unemployment benefits, that she had not been fired for work-related misconduct. *Id.* at 1063. In regard to the credibility of the witnesses, the Ninth Circuit stated that Villiarimo's assertion was "unavailing" because courts "only require that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Id.* (citation omitted). The Ninth Circuit noted that Villiarimo did not present evidence that the airline did not honestly believe its proffered reasons. *Id.*

Defendants rely on this specific portion of *Villiarimo* to argue that JN honestly believed that it was firing Lales because he lied to customers about the air conditioning in their truck, and thus, this court should affirm the circuit court's grant of summary judgment. Defendants' reliance on this portion, however, is misplaced because in the present case, there is a genuine issue of material fact as to whether JN honestly believed its reasons for its actions, specifically given that Lales put forth evidence, through his declaration, that indicates an allegedly retaliatory intent on the part of Marxen when he terminated Lales. Accordingly, Defendants' reliance on *Villiarimo* is not persuasive.

Accordingly, the ICA did not err in reversing and remanding the circuit court's granting of summary judgment on Lales's retaliation claims against JN.

**D. Lales produced sufficient evidence to raise genuine issues of material fact as to COAs 1, 2, 5, and 6**

Defendants also generally challenge the evidence submitted by Lales in opposition to the motions for summary judgment. Defendants argue that because Lales's evidence was "faulty," the circuit court's grant of summary judgment should be affirmed. More specifically, Defendants argue that the ICA gravely erred by:

(1) largely ignoring the evidence presented by [Defendants], and only viewing [Lales's] "evidence" in the light most favorable to him; (2) considering inadmissible "evidence" and uncorroborated self-serving statements submitted by [Lales] in a sham declaration; and (3) considering [Lales's]

inadmissible evidence to find that material facts existing so as to preclude summary judgment.

As discussed below, Defendants' arguments are without merit, and Lales's evidence was sufficient to raise a genuine issue of material fact as to all the challenged COAs.

### 1. The ICA did not improperly ignore evidence presented by Defendants

Defendants argue that the ICA "ignored" evidence that they presented with their motion for summary judgment and relied only on Lales's evidence. Defendants point out that the background section of the ICA's memorandum opinion and the ICA's analysis rely largely on Lales's submissions to the circuit court. As set forth below, the ICA properly viewed the evidence in the light most favorable to Lales. Moreover, to the extent Defendants' evidence conflicts with that of Lales's it raises a dispute as to issues of material fact, making summary judgment inappropriate.

 This court has held that, once a summary judgment movant has satisfied its initial burden of producing support for its claim that there is no genuine issue of material fact, the party opposing summary judgment must "demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *French v. Haw. Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004) (emphasis omitted). "The evidence must be viewed in the light most favorable to the non-moving party." *First Ins.*, 126 Hawai'i at 414, 271 P.3d at 1173. Here, the ICA specifically stated that it was viewing the evidence in the light most favorable to Lales. *Lales*, 2012 WL 1624013, at *1 n. 6, *15. The Defendants do not identify any legal authority that would require the ICA to explain how Defendants' evidence conflicts with that evidence. Rather, the ICA was required to view the evidence in the light most favorable to Lales to determine whether there were disputed issues of material fact worthy of trial. *Id.* Here, for example, the ICA stated that it relied on "the matters set forth in Lales's declaration in opposition to JN's motion for summary judg-

ment" to conclude that "Lales was subjected to persistent, derogatory, and unwelcome statements and comments about his ancestry and national origin" and that there were "genuine issues of material fact regarding [Lales's] claims against JN for harassment based on ancestry and national origin discrimination." *Lales*, 2012 WL 1624013, at *16. These facts were sufficient to raise a genuine issue of material fact and were, thus, "worthy of trial." *French*, 105 Hawai'i at 470, 99 P.3d at 1054.

Thus, Defendants' argument that the ICA erred in not considering its evidence and only relying on Lales's evidence is without merit.

### 2. Lales's declaration was consistent with his prior admissions and deposition statements, and thus, did not constitute a "sham affidavit"

Defendants argue that the ICA erred in relying on Lales's "conflicting, contradicting, uncorroborated, and self-serving" statements to conclude that there were genuine issues of material fact. Defendants argue that "[b]ased on the numerous inconsistencies and contradictions, the circuit court rightly disregarded conflicting portions of [Lales's] Declaration as self-serving and essentially a sham." As explained infra, the circuit court improperly made credibility determinations when it discounted Lales's declaration that was attached to his opposition to JN's motion for summary judgment. Moreover, Lales's declaration was not a sham and is not clearly and unambiguously inconsistent with his statements made in a prior deposition and prior admissions.

 Although Defendants argue that the circuit court did not err in explicitly stating that it made a credibility determination, it is clear that in ruling on a motion for summary judgment, the court must not make credibility determinations. *Del Rosario v. Kohanuinui*, 52 Haw. 583, 587 n. 4, 483 P.2d 181, 183 n. 4 (1971) ("The clash of evidence on this point makes a precise factual determination impossible and prompts a consideration of . . . credibility, an improper matter for summary judgment resolution.").

Moreover, Defendants' argument relies on a federal doctrine prohibiting "sham affidavits." In general, the "sham affidavit" doctrine applies when the affidavit of a non-moving party in a motion for summary judgment contradicts or is inconsistent with his or her previous deposition testimony. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2726 (3d ed. 1998). Under this doctrine, a non-moving party generally cannot create a genuine issue of fact "simply by submitting an affidavit contradicting his [or her] own prior testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir.2009).

The purpose of the "sham affidavit" doctrine is to preserve "the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir.1985)); *see also Van Asdale*, 577 F.3d at 998. However, the sham affidavit doctrine does not prohibit the non-moving party from "elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition" in his or her affidavit. *Van Asdale*, 577 F.3d at 999 (citation omitted). Furthermore, the sham affidavit doctrine does not prohibit attempts by the non-moving party to clarify inconsistencies that result from "an honest discrepancy, mistake, or newly discovered evidence." *Id.* (citation omitted).

The Ninth Circuit has held that two requirements must be met before the court can strike an affidavit and grant summary judgment: (1) the trial court must make a factual determination that the contradiction was indeed a "sham" produced to avoid summary judgment and (2) the inconsistencies have to be clear and unambiguous to justify striking the affidavit. *Id.* at 998–99. If either requirement is not met, the court must consider the non-moving party's affidavit in its determination to grant or deny summary judgment. *Id.* at 999.

This court has not explicitly adopted or rejected the sham affidavit doctrine as set forth by the Ninth Circuit, and we need not resolve this issue here. Even assuming ar-guendo that the sham affidavit doctrine is available, it would not be applicable in the instant case because Lales's declaration was not clearly and unambiguously inconsistent with his prior deposition and admissions.

Here, Defendants argue that the circuit court properly made a credibility determination regarding "numerous factual inconsistencies in [Lales's] own admissions that undermine his claims[,]" such as: (1) the allegedly changing circumstances regarding Lales's meeting with Marxen, in which Lales requested to be transferred from Martinez's supervision, and (2) Lales's alleged inconsistent statements regarding his consent to the use of the name "Frenchy." However, these "inconsistencies" are not so "clearly and unambiguously inconsistent" that Lales's declaration would be disregarded under the sham affidavit doctrine. *Id.* at 998–99.

Defendants argue that Lales's rendition of his conversation with Marxen regarding changing sales teams was inconsistent because he admitted that he requested a transfer from Martinez's sales team because of "personality conflicts," and also stated in his prior deposition that he "told [ ] Marxen that [he] was really tired of [ ] Martinez['s] behavior toward [him], the way he treated [him], the way he would almost on a daily basis threaten[ ] [him] physically to go to the boneyard and retaliat[ed] against [him] on a daily basis." However, these statements are not inconsistent with Lales's subsequent declaration, wherein Lales stated, "I verbally complained to [ ] Marxen about the harassment and [ ] Martinez" and that he asked to be transferred from Martinez's team because of Martinez's behavior toward him, which included derogatory remarks toward Lales, such as "French fries," "French are [wimps]," "French do not know how to fight," "French people stink," and "French women are whores[.]" Thus, Lales's statements regarding his conversation with Marxen were not inconsistent inasmuch as the declaration merely clarified his prior statements.

Defendants also contend that Lales's declaration is inconsistent with Lales's admission that he "never submitted complaints to

management regarding the use of the nickname 'Frenchy[,]'" and a deposition in which Lales stated that he used the name "Frenchy" and signed this nickname on documents. Lales stated in his subsequent declaration that he "never consented to any of these discriminatory remarks made concerning [his] national origin/ancestry or the derogatory treatment of [him] by Defendant[,]" and that he felt like the name "Frenchy" was "offensive." Lales's statement in his declaration is not inconsistent with his prior admission and statement in his deposition. First, contrary to Defendants' characterization of Lales's admission, Lales only admitted that he never submitted "written" complaints to management regarding the use of the name, "Frenchy." Second, in a deposition Lales stated that he "probably did" refer to himself as Frenchy, but explained that he did so out of fear of retaliation. Therefore, it is not inconsistent for Lales to state in his declaration that he did not consent to being called "Frenchy." Lales clearly stated in his admission that he did not file a written complaint, but stated that he orally complained, and he expressly stated a few times in his deposition that he used the name "Frenchy" because of his fear of retaliation. Lales's declaration explained the prior statements that he made.

Accordingly, the challenged portions of the declaration are not clearly and unambiguously inconsistent with Lales's prior deposition statements and admissions. Thus, Lales's declaration was not a "sham."

### 3. The ICA did not improperly rely on inadmissible evidence

Defendants contend that the ICA improperly relied on "speculation and conclusory statements by Lales" and also evidence that was "conflicting and inadmissible." Defendants appear to assert that the ICA improperly relied on the following exhibits and statements that were attached to Lales's opposition to JN's motion for summary judgment: (1) an EEOC interview and statements, which were not authenticated or sworn to; (2) an EEOC Determination letter, which Defendants assert was hearsay; (3) a complaint of another employee against JN,

which Defendants also assert was hearsay; (4) copies of newspaper and blog articles; and (5) Lales's statement in his declaration that other employees lied to the customers about the air conditioning and were not fired. Also, Defendants contend that Lales made many inadmissible, conclusory statements in his declaration that were not based on personal knowledge, such as: (1) claiming that he was hired by Carlton Hill; (2) asserting that he was transferred by Paul Tucker; and (3) using the legal terms "discriminated" and "retaliation." As discussed below, the ICA did not rely on inadmissible evidence in its determination.

Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e) (2000), provides, in relevant part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(Emphasis added).

Here, the ICA did not rely on the EEOC interview and statements, EEOC Determination letter, complaint of a fellow employee, or newspaper and blog articles in concluding that Defendants were not entitled to summary judgment, and the ICA did not mention these exhibits in its memorandum opinion. *See Lales,* 2012 WL 1624013, at \*\*1–18. The ICA relied only on Lales's declarations to determine that there were "genuine issues of

material fact regarding Lales's claims against JN for harassment based on ancestry and national origin discrimination." *Id.* at *16.

As to the retaliation claims, the ICA relied on Lales's statement that he complained to Marxen about the harassment, and that Lales was subsequently terminated within one month of reporting the alleged discriminatory conduct. *Id.* at *17. Although the ICA did not specifically state what it relied on to conclude that there was an issue of material fact as to whether JN's proffered reasons for Lales's termination were pretextual, Lales stated in his declaration that he denied telling the customers that the truck had air conditioning. All these statements by Lales would be admissible because they are from his "personal knowledge." *See* HRCP Rule 56(e). In addition, the allegedly improper evidence was not necessary to the ICA's outcome. Accordingly, Defendants' arguments regarding this evidence are misplaced.

With regard to Defendants' argument that Lales's Declaration contained inadmissible conclusory statements, those alleged conclusory statements are irrelevant because the ICA did not rely on them in making its determination to vacate summary judgment. In regard to the claim that Lales used the legal terms "discriminated" and "retaliation" throughout his declaration, again, there is no indication that the ICA relied on Lales's use of these terms in making its determination.

Thus, the ICA did not rely on inadmissible evidence to conclude that the circuit court erred in granting summary judgment.

### E. The circuit court erred in granting summary judgment in favor of JN on COA 4

Defendants assert that the ICA erred in vacating summary judgment in favor of JN on COA 4 because the remedies available to Lales in COA 4 were covered by remedies in HRS chapter 378, and accordingly, the circuit court did not err in granting summary judgment in favor of JN on COA 4. As discussed below, Defendants' assertion has merit if the public policy claim was derived from the provisions of HRS chapter 378.

However, inasmuch as the parties did not address the basis for Lales's public policy claim in relation to JN's motion for summary judgment, the basis for COA 4 is unclear, and thus, the ICA did not err in vacating summary judgment.

Although JN challenged all of Lales's claims in its motion for summary judgment, it did not provide any argument regarding why the circuit court should have granted summary judgment on COA 4 in its memorandum in support of its motion. At the hearing on JN's motion for summary judgment and after being asked by Lales's counsel if the circuit court also ruled on the public policy count, the circuit court stated, "I am granting Summary Judgment on all counts. The public policy count runs ... together with the reasoning that I have previously cited." The circuit court did not address the public policy issue in its findings of fact and conclusions of law.

In *Ralston*, this court described the burden in motions for summary judgment,

> First, the moving party has the burden of <u>producing support for its claim</u> that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. <u>Only when the moving party satisfies its initial burden of production does the burden shift to the nonmoving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.</u>

129 Hawai'i at 56–57, 292 P.3d at 1286–87 (emphasis added).

In the instant case, JN never provided support for its motion for summary judgment on the public policy claim. As such, Lales was not required to present evidence sufficient to raise an issue of material fact as to whether JN's termination of Lales violated public policy. *Id.* Moreover, Lales was not given an opportunity to respond to any arguments regarding the public policy claim. *See Edwards v. Honeywell, Inc.*, 960 F.2d 673,

674 (7th Cir.1992) (noting that the trial court "erred by granting summary judgment on grounds to which [the non-moving party] was given either an inadequate opportunity or no opportunity to respond"). Thus, the ICA did not err in vacating the circuit court's grant of summary judgment in favor of JN on the public policy claim.

■ In their application, Defendants contend that Lales's public policy claim is "based on the same factual basis as the counts based in HRS chapter 378." Defendants cite to the first amended complaint and argue that Lales did not allege "any new facts or any new elements in his Amended Complaint relating to [COA] 4." In his first amended complaint, Lales "reincorporate[d] and reallege[d] paragraphs 1 through 27" and asserted that his termination "was in violation of public policy for which [Defendants] are liable." Although it may appear that the public policy claim would be based on the same facts as the HRS chapter 378 claims, the record is unclear as to the scope of the public policy claim.

As Defendants and ICA note, however, should the circuit court determine on remand that the public policy claim is indeed derived from HRS chapter 378, such a claim would be barred. In *Takaki v. Allied Machinery Corporation*, the ICA stated, "If ... the statutory or regulatory provisions which evidence the public policy themselves provide a remedy for the wrongful discharge, provision of a further remedy under the public policy exception is unnecessary." 87 Hawai'i 57, 63, 951 P.2d 507, 513 (App.1998); *see also Ross v. Stouffer Hotel Co.*, 76 Hawai'i 454, 464, 879 P.2d 1037, 1047 (1994) (noting that a claim for wrongful termination in violation of public policy cannot be asserted "where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation").

Therefore, the ICA did not err in vacating the circuit court's granting of summary judgment in favor of JN on the public policy claim.

## IV. Conclusion

In sum, summary judgment in favor of Marxen on COAs 1 and 2 was appropriate in this case. However, summary judgment in favor of JN on COAs 1, 2, 4, 5, and 6, was inappropriate. Therefore, we affirm in part and vacate in part the ICA's judgment and remand to the circuit court for further proceedings.

Concurring and Dissenting Opinion by ACOBA, J.

I would hold first, that Petitioner/Defendant–Appellee Gary Marxen, Sr. (Marxen), a supervisory employee of Petitioner/Defendant–Appellee Wholesale Motors Company (JN) was not entitled to summary judgment regarding the Hawai'i Revised Statutes (HRS) Chapter 378 claims of Respondent/Plaintiff–Appellant Gerard R. Lales (Lales), a former employee of JN, inasmuch as genuine issues of material fact existed as to whether Marxen, as Lales' supervisor, aided, abetted, incited, compelled, or coerced the doing of a discriminatory practice in violation of HRS § 378–2(a)(3).[1]

In my view, Marxen may be subject to individual liability under HRS § 378–2(a)(3). I would therefore vacate the entry of sum-

---

1. HRS § 378–2 (Supp.2002) provided in relevant part as follows:

§ 378–2 **Discriminatory practices made unlawful; offenses defined.**
(a) It shall be an unlawful discriminatory practice:
(1) Because of race, sex, including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record:
(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment;

...
(2) For any employer, labor organization, or employment agency to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited under this part;
(3) For any person, whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so[.]
(Emphases added.)

mary judgment of the Circuit Court of the First Circuit (the court)[2] in favor of Marxen as to Lales' state ancestral harassment claim (harassment claim) and retaliatory discharge claim and remand to the court for application of HRS § 378–2(a)(3). However, Marxen may not be individually liable to Lales under HRS § 378–2(a)(1). Rather, HRS § 378–1[3] and HRS § 378–2(a)(1) do not support holding supervisory employees or "agents" such as Marxen individually liable for alleged discriminatory conduct (employee liability) under HRS § 378–2(a)(1).

Further, I believe the adoption of Hawai'i Administrative Rule (HAR) § 12–46–175(d),[4] which in effect imposes absolute liability on employers for ancestral harassment[5] by their supervisory employees (employer strict liability) exceeded the statutory authority granted the Hawai'i Civil Rights Commission (HCRC) under HRS §§ 368–3[6] and 378–2.[7] Instead, under HRS Chapter 378, a proper balance between the interests of employers and employees is struck by applying the principles of liability enumerated in the Restatement (Second) of Agency (Second Restatement) § 219.[8]

Finally, Marxen's employer, JN, should not be able to avail itself of the so called "*Faragher* [affirmative] defense"[9] to an em-

2. The Honorable Randall K.O. Lee presided.

3. HRS § 378–1 (1993) provides in relevant part as follows:

> "Employer" means any person, including the State or any of its political subdivisions and any agent of such person, having one or more employees, but shall not include the United States.

(Emphases added.)

4. HAR § 12–46–175(d) (1990) provides in relevant part as follows:

> (d) An employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of ancestry regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The commission will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in a supervisory or agency capacity.

(Emphasis added.)

5. HAR 12–46–175(b) (1990) provides in relevant part as follows

> (b) Ethnic slurs and other verbal or physical conduct relating to an individual's ancestry constitute harassment when this conduct:
> (1) Has the purpose or effect of creating an intimidating, hostile, or offensive working environment;
> (2) Has the purpose or effect of unreasonably interfering with an individual's work performance; or
> (3) Otherwise adversely affects an individual's employment opportunity.

6. HRS § 368–3 (Supp.2004) provides in relevant part as follows:

> **§ 368–3 Powers and functions of commission.**

> The commission shall have the following powers and functions:
> . . .
> (9) To adopt rules under [HRS] chapter 91.

Pursuant to HRS Chapter 91, an agency may adopt rules following a public hearing and an opportunity for interested persons to submit data, views, or arguments. HRS § 91–3.

7. HAR § 12–46–175 lists HRS § 378–2 as "implied authority" for the Rule. The majority appears to assume that HAR § 12–46–175(d) is based on HRS § 378–2. *See* majority opinion at 355, 328 P.3d at 364. The authority for HAR § 12–46–175(d) appears to be HRS § 378–2(a)(1)(A), which makes it an unlawful discriminatory practice for "any employer" to "discriminate against any individual in compensation or in the terms, conditions, or privileges of employment." (Emphasis added.)

8. Second Restatement § 219 provides as follows:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
> (a) the master intended the conduct or the consequences, or
> (b) the master was negligent or reckless, or
> (c) the conduct violated a non-delegable duty of the master, or
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

(Emphases added.)

9. In *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the United States Supreme Court held that an affirmative defense was available in Title VII cases as follows:

ployer's vicarious liability applicable in Title VII federal harassment actions in state suits under HRS Chapter 378.[10] The Supreme Court adopted the *Faragher* defense on the basis of Congressional legislative history unique to Title VII. The defense is not compatible with a state claim brought under HRS § 378–2(a)(1) and thus JN may not avoid vicarious liability under section 219 of the Second Restatement.[11] Therefore, I would remand Lales' harassment claim against JN under HRS § 378–2(a)(1) to the court with instructions to apply the principles in section 219 of the Second Restatement.[12]

## I.

### A.

#### 1.

Lales filed an amended complaint on February 20, 2004, asserting, *inter alia*, that

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages. ... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 (emphases added). The Supreme Court reached the same conclusion in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), a companion case to *Faragher*. This defense is referred to herein as the *"Faragher* defense."

10. "Title VII" refers to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. Title VII prohibits employers, employment agencies, and labor organizations from discriminating against any individual in the employment context based on the individual's race, color, religion, sex, or national origin. *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 425, 32 P.3d 52, 69 (2001).

11. The majority also holds that the court improperly allowed JN to invoke *Faragher* as a defense to Lales' Title VII claims. I agree with the majority as to Title VII claims inasmuch as the *Faragher* defense does not apply to Title VII claims when a genuine issue of material fact

Marxen and JN [13] had engaged in "discriminatory acts" and retaliatory discharge as set forth in HRS chapter 378. The Complaint further alleged that Marxen was Lales' supervisor and that Lales had been harassed by both Marxen and Johnny Martinez (Martinez), who had been both Lales' co-employee and supervisor. The complaint asserted six causes of action, including, *inter alia*, (1) discriminatory acts in violation of Chapter 378 [14] of the HRS and (2) retaliatory discharge in violation of Chapter 378 of the HRS.[15] Inasmuch as Lales cited HRS Chapter 378 in the Complaint, his Complaint could subject Marxen to liability under either HRS § 378–2(a)(1) or HRS § 378–2(a)(3). *See In re Genesys Data Technologies, Inc.*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) ("Pleadings must be construed liberally.").

Pertinent to the question of employee liability, on May 3, 2006, Marxen filed a motion

exists as to whether a supervisor's harassment culminated in a tangible employment action.

12. I agree with the majority that there were genuine issues of material fact regarding whether JN's proffered reasons for Lales' termination were pretextual, that Lales' produced sufficient evidence to raise genuine issues of material fact as to his state and federal harassment claims against JN. I also agree that the basis for Lales' public policy claim is not clear from the record. *Cf. Takaki v. Allied Machinery Corporation*, 87 Hawai'i 57, 64, 951 P.2d 507, 514 (App.1998). I therefore concur in affirming the ICA's decision vacating the court's entry of summary judgment in favor of JN with respect to Lales' first, second, fourth, fifth, and sixth causes of action.

13. The amended complaint also named Johnny Martinez (Martinez) as a defendant. The court granted summary judgment in favor of Martinez, and this ruling was not challenged on appeal.

14. The amended complaint did not specify which sections of HRS Chapter 378 Marxen or JN violated.

15. The complaint also asserted causes of action for (3) breach of the employment contract, (4) unlawful termination as against public policy, (5) discriminatory acts in violation of section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e–2, and (6) retaliatory discharge for Lales' opposition to the harassment he suffered in violation of section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). The first four claims asserted violations of state law, whereas the final two claims asserted violations of federal law.

for summary judgment, arguing, *inter alia,* that individual employees cannot be sued under HRS § 378–2(a)(1) and therefore he was entitled to summary judgment on Lales' first and second causes of action. Marxen attached a copy of his deposition to his motion for summary judgment. In the deposition, Marxen related that he was the "general sales manager" at JN and that Lales was a "car salesman" at JN. Marxen explained that he "was not the one who made the decision to fire [Lales]" but that he "did the paperwork."

Marxen recounted that Lales was initially terminated for "missing a sales meeting" and "lack of production." However, Marxen suspended the original termination because Lales had asked for an opportunity to improve his sales during that weekend. Nevertheless, Lales was terminated the next day after Joey Dempsey, Lales' immediate supervisor, reported that Lales lied to a customer. Marxen's son, Gary Marxen Jr., the "used car manager" therefore instructed Dempsey to fire Lales. Marxen approved of his son's decision.

Lales filed a memorandum in opposition, arguing that a supervisor, such as Marxen, was an "agent" included in the definition of "employer" in HRS § 378–1 and therefore could be liable under HRS § 378–2(a)(1) for acts committed by an employer. Lales' attached declaration asserted that at one point Marxen told Martinez, who was Lales's co-employee and would later become Lales' supervisor, to "beat his [ ] French ass[.]" Subsequently, Martinez allegedly "subjected [Lales] to ancestry harassment." This harassment included "derogatory remarks" and "threats." Lales "complained orally to [ ] Marxen that [he] did not appreciate the remarks made concerning [his] ancestry." Marxen apparently did not take any action in response to these complaints. However, Lales was terminated following his complaints to Marxen, his co-workers, "and others."

Lales' declaration also stated that the reasons given by JN for Lales' firing were false. Lales maintained that he did not have the lowest sales at the time of his termination,

that he missed the sales meeting because he did not receive notice of the meeting, and that he did not "know [of] anybody to be terminated for not attending a sales meeting." Lales denied that he lied to a customer regarding whether a car was equipped with air conditioning. Instead, Lales claimed that he was fired "as retaliation" for his complaint.

On July 14, 2006, the court granted summary judgment in favor of Marxen on all counts. The court did not decide whether Marxen could be individually liable under HRS chapter 378. Instead, the court determined that Lales could not sue Marxen because Marxen was not listed in the Lales' right to sue letter from the HCRC.[16]

2.

Pertinent to the question of employer strict liability, on June 30, 2006, JN also filed a motion for summary judgment. On August 29, 2006, the court issued findings of fact (findings), conclusions of law (conclusions), and an order granting summary judgment in favor of JN on all counts. The court apparently granted summary judgment on Lales' first cause of action, the state harassment claim, and Lales' fifth cause of action, the federal harassment claim, on the basis of the *Faragher* defense. Conclusion 29 stated that "in [*Faragher*] the U.S. Supreme Court held that if a plaintiff unreasonably fails to avail himself or herself of the employer's preventative or remedial apparatus, he or she should not recover damages that could have been avoided if he or she had done so." Conclusion 31 further stated that Lales "was fully aware [of JN's] procedure for any complaint for discrimination" and failed to follow that procedure. In conclusion 33 the court granted summary judgment "as to any claims relating to hostile work environment harassment," i.e., claims one and five.

B.

On appeal, the ICA determined that Marxen could be held individually liable under

---

**16.** The ICA held that the court erred in granting summary judgment based on the failure to name Marxen in the letter. *Lales v. Wholesale Motors* *Co.,* No. 28516, 127 Hawai'i 412, 2012 WL 1624013, at *9 (App. May 9, 2012). Marxen did not challenge the ICA's determination.

both HRS §§ 378–2(a)(1) and 378–2(a)(3). The ICA concluded that "employees are subject to individual liability under HRS § 378–2 when they are agents of an employer or when they aid, abet, incite, compel, or coerce prohibited discriminatory practices." *Lales,* 2012 WL 1624013, at *10. Therefore, the ICA concluded, Marxen was not entitled to summary judgment on Lales' HRS chapter 378 claims.

Several amicus briefs filed with the ICA also discussed the applicability of the *Faragher* defense. Briefs by amici curiae the Chamber of Commerce of Hawai'i, the Hawai'i Employers Council, and the Hawai'i Automobile Dealers Association all argued that the court's adoption of *Faragher* defense should be affirmed. The HCRC, on the other hand, argued that the *Faragher* defense was incompatible with HAR § 12–45–175(d). The ICA did not decide whether the *Faragher* defense should apply or whether HAR § 12–46–175(d) exceeded the scope of the HCRC's statutory authority.

Rather, the ICA held that "as *Faragher* itself makes clear, the affirmative defense does not apply 'where a supervisor's harassment culminates in tangible employment action, such as a discharge[ ].' Here, because the alleged harassment by Marxen did culminate in Lales's discharge, the *Faragher* affirmative defense did not apply." *Lales,* 2012 WL 1624013, at *15. Hence, the ICA concluded that it "need not address what the result would be in a different case where a supervisor's alleged harassment does not culminate in tangible employment action [i.e., the *Faragher* defense would apply]." *Id.*

**II.**

With respect to employee liability, I would hold that Marxen is subject to liability in his individual capacity on Lales' first and second causes of action pursuant to HRS § 378–2(a)(3). As stated before, HRS § 378–2(a)(3) provides that it is an unlawful discriminatory practice for "any person, whether an employer, employee, or not, to aid,[17] abet,[18] incite,[19] compel,[20] or coerce [21] the doing of any of the discriminatory practices forbidden by this part." As to HRS § 378–2(a)(3), Lales contends that "Marxen's acts were that of an agent ... aiding and abetting in ancestry harassment against [ ] Lales for which he can be individually liable."

In his Reply, Marxen argues that the "theory of aiding and abetting is completely irrelevant to this case," because there is no evidence that Marxen aided, abetted, incited, compelled or coerced other persons in the doing of discriminatory practices. Marxen points out that "[Lales] did not allege that [ ] Marxen aided and abetted anyone in his Amended Complaint," that Lales did not allege in his opposition to Marxen's motion for summary judgment that "Marxen aided and abetted anyone in violating HRS § 378–2[ (a)(3) ]," and that "the first time that [Lales] has made this allegation is in the Response, and [he] has still not identified who [Marxen] is alleged to have aided or abetted."

Contrary to Marxen's position, the evidence submitted by Lales created a genuine issue of material fact as to whether Marxen aided, abetted, incited, compelled, or coerced other persons in the doing of discriminatory

**17.** "Aid" is defined as "to render assistance" or "to provide what is useful in achieving an end." *Merriam–Webster's Collegiate Dictionary* 25 (9th ed. 1993); *see also Leslie v. Board of Appeals of County of Hawai'i,* 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006) ("This court has said that we may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." (internal quotation marks and brackets omitted)).

**18.** "Abet" is defined as "to actively second and encourage" or "to assist and support in the achievement of a purpose." *Merriam–Webster's Collegiate Dictionary* 3.

**19.** "Incite" is defined as "to move to action," or to "stir up" or "spur on" or "urge on." *Merriam–Webster's Collegiate Dictionary* 588.

**20.** "Compel" is defined as "to drive or urge forcefully or irresistibly" or "to cause to do or occur by overwhelming pressure." *Merriam–Webster's Collegiate Dictionary* 234.

**21.** "Coerce" is defined as "to compel an act or choice" or "to bring about by force or threat." *Merriam–Webster's Collegiate Dictionary* 222.

practices for both Lales' first and second causes of action.[22] *See Ralston v. Yim*, 129 Hawai'i 46, 56, 292 P.3d 1276, 1286 (2013) (holding that summary judgment is appropriate only if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law") (internal quotation marks omitted); *accord French v. Hawai'i Pizza Hut, Inc.*, 105 Hawai'i 462, 470–72, 99 P.3d 1046, 1054–56 (2004).

### A.

In Lales' first cause of action, he alleges that he was subject to harassment and physical threats by Marxen, Martinez, and other co-workers. Lales asserted in his declaration that Marxen had told Martinez to "beat his [ ] French ass," and that Martinez subsequently repeatedly harassed Lales. Viewed in the light most favorable to Lales, Marxen's statement could be viewed as "inciting," i.e., "urging on" or "spurring on" or "abetting," i.e., "seconding or encouraging" the discriminatory acts of Martinez, especially in light of Marxen's position of authority as supervisor. *See Schefke*, 96 Hawai'i at 417, 442, 32 P.3d

at 61, 86 (holding that a defendant "incited the doing of a discriminatory practice" by telling another defendant that the plaintiff should not receive a Christmas bonus because the plaintiff " 'stabbed him in the back' " by filing a discrimination complaint).

Furthermore, in his declaration, Lales explained that Marxen took no action in response to his complaints regarding the harassment of Martinez and other employees. Viewed in the light most favorable to Lales, Marxen's refusal to put a stop to Martinez's discriminatory remarks following Lales' complaints could be viewed as "aiding" or "abetting" Martinez's harassment by "rendering assistance" inasmuch as Marxen had the authority to halt Martinez's actions but did not do so.

### B.

In his second cause of action, Lales alleges that the defendant's discriminatory acts and his ultimate discharge were in retaliation for his complaints. In *Schefke*, this court explained that "a retaliation claim under HRS § 378–2(2) is subject to [a] three-part test[.]" 96 Hawai'i at 426, 32 P.3d at 70. First, "the

---

**22.** The majority contends that Lales waived any argument that Marxen was liable under HRS § 378–2(a)(3) because he did not allege that Marxen was liable on that ground in his Amended Complaint, and did not raise that argument in response to Marxen's motions for summary judgment or before the ICA. Majority opinion at 343 n. 9, 328 P.3d at 352 n. 9. Respectfully, the majority is incorrect. To reiterate, in his Amended Complaint, Lales stated that Marxen's acts violated "HRS Chapter 378." Lales alleged that Martinez was at times his co-worker, that Marxen was his supervisor, and that both Martinez and Marxen harassed Lales. Thus, it may be construed reasonably that Marxen "aided, abetted, incited, compelled, or coerced" Martinez's harassment of Lales, and therefore was liable under HRS § 378–2(a)(3). *See In re Genesys*, 95 Hawai'i at 41, 18 P.3d at 903.

Further, the ICA held that HRS § 378–2(a)(3) was pertinent to Lales' claim, because "employees are subject to individual liability under HRS § 378–2 when they are agents of an employer <u>or when they aid, abet, incite, compel, or coerce prohibited discriminatory practices</u>," and concluded that "Marxen was not entitled to summary judgment on Lales's HRS Chapter 378 claims." *Lales*, 2012 WL 1624013, at *10 (emphasis added). Finally, Lales raised this argument before this court both in his Response and at oral argument. Because this issue was includ-

ed in Lales' Amended Complaint, was decided by the ICA, and raised before this court, it is appropriate to resolve it here.

Of course, plain error also may be noticed regarding HRS § 378–2(a)(3). "[O]ur discretionary power to notice plain error ought to be exercised in civil cases if: (1)[ ] consideration of the issue not raised at trial requires additional facts, (2)[ ] its resolution will affect the integrity of the trial court's findings ... and (3)[ ] the issue is of great public import." *State v. Fox*, 70 Haw. 46, 56 n. 9, 760 P.2d 670, 676 n. 9 (1988); *accord Earl M. Jorgensen Co. v. Mark Const., Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975).

No additional facts are required to consider whether Marxen can be held liable under HRS § 378–2(a)(3). Resolution of the issue will not affect any findings of the trial court. *Earl M. Jorgensen Co.*, 56 Haw. at 476, 540 P.2d at 985 ("The consideration of this issue raised for the first time on appeal will not affect the integrity of any findings ... by the trial court[.]"). Finally, the question is one of great public import inasmuch as it requires interpretation of the applicability of HRS § 378–2(a)(3). *Cf. Earl M. Jorgensen Co.*, 56 Haw. at 476, 540 P.2d at 985 (applying plain error in a civil case because, *inter alia*, "[t]he matter is one of first impression in this jurisdiction, and calls for the interpretation and elucidation of HRS § 490:2–719(2)").

plaintiff must establish a prima facie case of such retaliation by demonstrating that" he or she, *inter alia*, "has opposed any practice forbidden by [HRS Chapter 378]." Second, "if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Third, "if the defendant articulates such a reason, the burden shifts back to the plaintiff to show evidence demonstrating that the reason given by the defendant is pretextual." *Id.*

Here, Lales' declaration established that he "opposed" the harassment prohibited by HRS § 378–2(a)(1) by complaining to Marxen and others. Although Marxen provided non-discriminatory reasons for the termination, Lales presented evidence that the reasons given by Marxen were pretextual inasmuch as Lales asserted that he did not have the lowest sales when he was terminated, did not know of anyone being terminated for missing sales meetings, and did not lie to a customer. Hence, Lales met his burden of establishing a prima facie case of retaliation under HRS § 378–2(a)(2).

In his deposition, Marxen explained that although he did not personally make the decision to fire Lales, he ultimately approved that decision. Based on the foregoing, Marxen's approval of Lales' termination could be construed as "aiding" or "abetting" the discriminatory act of firing Lales in retaliation for Lales' complaints. *See Schefke*, 96 Hawai'i at 442, 32 P.3d at 86 ("[U]nder the broad language of HRS § 378–2[ (a) ](3), [a defendant] can be liable even if he was 'offering advice, not making any decision.' "). Moreover, the firing of Lales in retaliation for his complaints could be viewed as "aiding" or "abetting" prior discrimination because that action served to protect those who had previously discriminated against Lales. Marxen acknowledged that he played a role in firing Lales. Marxen, then, could be said to have aided or abetted the discriminatory acts. Lales also stated at oral argument that HCRC § 378–2(a)(3) could apply, because "there were more than two people making the slurs" against Lales.

### C.

Viewing the evidence in the light most favorable to Lales, issues of material fact exist on Lales' first and second causes of action regarding whether Marxen is subject to liability based on HRS § 378–2(a)(3). Hence, summary judgment was wrongly granted, and the court's order granting summary judgment as to Lales' first and second causes of action should be vacated.

### III.

However, the ICA incorrectly determined that Marxen was individually liable to Lales under HRS § 378–2(a)(1). The definition of "employer" in HRS § 378–1 plainly does not include individual agents or employees, such as Marxen. Marxen, as a supervisory agent or employee, thus cannot be held individually liable under HRS § 378–2(a)(1), which applies only to "employers." This construction is consistent with (1) the ordinary and usual meaning of the words employed, (2) other provisions of Chapter 378, such as HRS § 378–2(a)(3), and the overall scheme of Chapter 378, and (3) federal interpretations of the analogous provision in Title VII.

### A.

To reiterate, HRS § 378–1 defines an "employer" as "any person, including the State or any of its political subdivisions and any <u>agent</u> of such person, having one or more <u>employees</u>." (Emphasis added.) HRS § 1–14 commands that "[t]he words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning." In HRS § 378–1, the terms employer, agent, and employee are all used in the same sentence.

The word "agent" generally means "one who is authorized to act for or in place of another." Merriam–Webster's Collegiate Dictionary at 22 (9th ed. 1993); *accord* Black's Law Dictionary 72. The plain meaning of the word "agent" is an individual who is <u>not</u> an employer, but instead someone who acts for a principal such as an employer and

is therefore subject to the direction of an employer or other principal. Thus, giving the term agent its "usual signification," "without attending so much to the literal and strictly grammatical construction of the words," agent must be interpreted in the HRS § 378–1 to mean an entity other than an "employer." [23] This construction is confirmed in reading the other provisions in HRS Chapter 378, in pari materia, with the definition in HRS § 378–1. *See* discussion *infra.* Agent, then, would not subsumed within the term "employer." [24]

An "employee" is "[a] person who works in the service of another under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Black's Law Dictionary* 602 (9th ed. 2009). Obviously, an employee then is not an employer. Under the plain meaning of both terms, and in the context of HRS § 378–1, neither an "agent" nor an "employee" can be an "employer."

If "employee" and "agent" were synonymous there would be no need to use both terms. As used in HRS § 378–1, an agent is not an employee (supervisory or otherwise).[25] When two words are used in "close juxtaposition," it may be "inferred that the legislature realized the difference in meaning[s]." *Cf. In re Fasi,* 63 Haw. 624, 627, 634 P.2d 98, 101 (1981) (holding that "where 'shall' and 'may' are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used

should carry with them their ordinary meanings").

Thus, in using the term agent in the same sentence as employee, it is manifest that the legislature did not intend for an agent to be construed as synonymous with or inclusive of the term employee (or supervisory employee) in HRS § 378–1. In retaining the independent significance of the terms agent and employee, the legislature indicated that both agents and employees act under the employer's direction. Therefore, the term agent as used in HRS § 378–1 is not intended to be synonymous with the term employee.

Accordingly, the term "employer," which indicates who may be sued in HRS § 378–2 for discriminatory practices, would not include an agent, such as supervisory employees. Agents and supervisory employees therefore would not be subject to personal liability under HRS § 378–2.[26] For similar reasons, it seems indisputable that an employee, supervisory or not, is not an "employer" and therefore would not fall within the term "employer" in HRS § 378–2(a)(1) so as to be subject to individual liability under that section.

### B.

This court has also explained that "each part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole." *Kam v. Noh,* 70 Haw. 321, 326, 770 P.2d 414, 418 (1989). Interpreting "agent"

---

**23.** Thus, "employer" cannot be defined to include an employer's agent.

**24.** If the term "agent" were construed as synonymous with employer, "agent" would not be given its "usual signification." As explained by Judge Mollway, the statute interpreted literally would provide that an "agent" would be an "employer" only if the agent "had one or more employees." *Lum v. Kauai County Council,* 2007 WL 3408003, at *11 (D.Haw. Nov. 9, 2007) (Mollway, J.). Judge Mollway's interpretation was affirmed by the Ninth Circuit. *Lum v. Kauai County Council,* 358 Fed.Appx. 860, 862 (9th Cir.2009) (unpublished) ("We agree with the district court's analysis of the Hawai'i statute's language[.]"). The legislative intent is also to be determined from the language used by the legislature. *See Hill v. Inouye,* 90 Hawai'i 76, 976 P.2d 390, 397 (1998) ("The starting point in statutory construction is

to determine the legislative intent from the language of the statute itself." (internal quotation marks omitted)). Hence, HRS § 378–1 does not "expressly state" that an agent may be an employer.

**25.** The plain language of HAR § 12–46–175(d) provides that an employer is liable for the acts of both its agents and supervisory employees. The HCRC would not have used both terms unless it recognized that the definition of "agent" is different from the definition of "supervisory employee." Additionally, as explained *supra,* if "agent" and "employee" were synonymous, it would not have been necessary for the legislature to use both terms in HRS § 378–1.

**26.** Thus, an employer's "agent" may not be held individually liable for his or her sole discriminatory conduct under HRS § 378–2(a)(1).

as incorporating the principles of respondeat superior is consistent with the overall scheme of HRS Chapter 378. In HRS § 378–2(a)(3), the legislature subjected to liability "any person, whether an <u>employer, employee, or not,</u>" who "aid[ed], abet[ted], incite[d], compel[led], or coerce[d] the doing of any of the discriminatory practices forbidden by this part." (Emphasis added.) The other provisions of HRS § 378–2 expressly apply only to employers or entities such as labor organizations. The legislature's specific inclusion of the term "employees" as being subject to liability only under HRS § 378–2(a)(3) confirms that the legislature did not intend to subject employees to liability under the other provisions of HRS § 378–2, including HRS § 378–2(a)(1), that apply to an "employer."

Inasmuch as no other provision in HRS § 378–2 refers to employees, it is evident that under HRS § 378–2 an employee is subject to liability only with respect to the acts described in HRS § 378–2(a)(3). The lack of any other reference to an employee means that employees, including supervisory employees, are not subject to the other provisions of HRS § 378–2, such as HRS § 378–2(a)(1), which specifically refers only to an employer. The text of HRS § 378–2 indicates that, when the legislature meant to subject individual employees to liability under HRS Chapter 378, it did so explicitly. *See also Luzon v. Atlas Ins. Agency, Inc.*, 284 F.Supp.2d 1261, 1265 n. 1 (D.Haw.2003) (Mollway, J.) ("[T]he legislature clearly knew how to include employees within a statute's scope[.]"); *White v. Pacific Media Group, Inc.*, 322 F.Supp.2d 1101, 1114 (D.Haw.2004) (Ezra, J.).

Also, under HRS § 378–6,[27] "every employer" must "make and keep records" that are relevant to unlawful discriminatory practices. It appears unlikely that the legislature intended individual supervisors to be responsible for keeping employment records, which would be the effect of treating individual "agents" or supervisory employees as "employers." *See Chatman v. Gentle Dental Center of Waltham*, 973 F.Supp. 228, 238 (D.Mass.1997) (interpreting similar provisions of Title VII and noting that "[i]f 'employer' were read consistently throughout the statute to include supervisors as agents of the employer, it would lead to the problematic result that individual supervisors would also shoulder these burdens" and that "[i]t is unlikely that Congress intended to impose such administrative duties on individual supervisors").

Furthermore, it is a fundamental principle of statutory construction that "[c]ourts are bound to give effect to all parts of a statute, and . . . no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Dejetley v. Kaho'ohalahala*, 122 Hawai'i 251, 264, 226 P.3d 421, 434 (2010). To repeat, HRS § 378–2(a)(3) allows suit against "any person, whether an employer, employee, or not. . . ." (Emphasis added.) Were employees, such as supervisory employees, encompassed in the definition of employer, then the word "employee" in HRS § 378–2(a)(3) would be superfluous inasmuch as an employee would have already been covered by the reference to "employer" in that provision. Hence, construing the term employer as meaning supervisory employee, would render the term "employee" in HRS § 378–2(a)(3) meaningless.[28]

---

**27.** HRS § 378–6 (1993) provides as follows:
(a) In connection with an investigation of a complaint filed under this part, or whenever it appears to the commission that an unlawful discriminatory practice may have been or is being committed, the commission's authorized representative shall have access to the premises of the parties or persons reasonably connected thereto, records, documents, and other material relevant to the complaint and shall have the right to examine, photograph, and copy that material, and may question employees and make investigation to determine whether any person has violated this part or any rule issued hereunder or which may aid in the enforcement of this part.
(b) Every employer, employment agency, and labor organization shall:
(1) Make and keep records relevant to this part, and
(2) Make such reports therefrom, as the commission shall prescribe by rule or order.
(Emphases added).

**28.** Insofar as employer is construed to include "agent," the term "or other" would to that extent also be nullified.

## C.

Finally, this court has held that "the federal courts' interpretation of Title VII [of the Federal Civil Rights Act of 1964] is useful in construing Hawai'i's employment discrimination law." *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 281, 971 P.2d 1104, 1116 (1999). This is because "Hawai'i's employment discrimination law was enacted to provide victims of employment discrimination the same remedies, under state law, as those provided by Title VII[.]" *Id.* (citing H. Stand. Comm. Rep. No. 549, in 1981 House Journal, at 1166; S. Stand. Comm. Rep. No. 1109, in 1981 Senate Journal, at 1363).

Title VII's definition of "employer" is substantially similar to the definition provided in HRS § 378–1. Pursuant to 42 U.S.C. § 2000e, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." (Emphasis added.) Nearly every federal circuit has concluded that the word "agent" is "an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer." *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir.1994); (internal quotation marks omitted)(emphasis added); *see also Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 181 (4th Cir.1998) (identifying decisions from the second, third, fifth, seventh, eighth, tenth and eleventh circuits, and the D.C. circuit, which concluded that individual supervisors are not employers under Title VII); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d

583, 587 (9th Cir.1993).[29] Thus, the federal courts' interpretations of "employer" in Title VII also indicate that "agent" in HRS § 378–1 should be read as imposing liability on an employer under the doctrine of respondeat superior, and not as allowing suits against individual employees as agents.

## IV.

On the other hand, the ICA concluded that Marxen is subject to liability under HRS § 378–2(a)(1) because, as an "agent," he falls within the statutory definition of "employer" in HRS § 378–1.

## A.

The ICA first contended that "[a] plain reading of the statutory provisions supports the conclusion that an individual employee, who is an agent of an employer, can be held individually liable as an 'employer.'" *Lales*, 2012 WL 1624013, at *10. However, in the grammatical structure of HRS § 378–1 an "agent" cannot be reasonably construed as an "employer," applying well recognized canons of statutory construction, *see* discussion *supra*, and federal authority in which we generally join. *See, e.g., Lissau*, 159 F.3d at 181.

## B.

Second, the ICA maintained that the extension of "aider and abettor liability" to any person also suggests that agents are subject to liability as employers. *Lales*, 2012 WL 1624013, at *11. The ICA argued that it would be inconsistent to allow individuals to be sued for aiding and abetting under HRS § 378–2(a)(3), and yet "'immunize [30] the in-

---

29. *Miller* concluded that "it is inconceivable that Congress intended to allow civil liability to run against individual employees" because of "the statutory scheme" of Title VII. 991 F.2d at 587 (emphasis added). *Miller* cited the inapplicability of Title VII to small businesses as one aspect of the statutory scheme that was inconsistent with including individual agents in the definition of employer. *Id.*

Similarly, as was explained in greater detail *supra*, defining "employer" to include "agents" is incongruous with several aspects of HRS Chapter 378. Defining an "employer" as including a supervisory employee would nullify the

terms "employee" or "other" in HRS § 378–2(a)(3) and would be inconsistent with the provisions of HRS Chapter 378 subjecting employers to record-keeping requirements.

30. Reading HRS § 378–1 to exclude suits against individual agents "does not actually 'immunize' individual employees," because they "remain liable for wrongdoing under other laws that they may have violated." *Maizner v. Hawai'i*, 405 F.Supp.2d 1225, 1237 (D.Haw.2005). Thus, finding that individual agents are not "employers" under HRS § 378–1 is no more than a

dividual agents'" who violate HRS § 328–2(a)(1). *Id.* (quoting *Sherez v. State of Hawai'i Dept. of Educ.*, 396 F.Supp.2d 1138, 1147 (D.Haw.2005) (Seabright, J.)).[31] However, the statutory framework plainly confines the liability of individuals to circumstances where those individuals aid or abet discrimination. HRS § 378–2(a)(3). Contrary to the ICA's position, the legislature's intent was clearly to <u>limit</u> individual employee liability exposure to circumstances where an individual engaged in discriminatory acts in concert with others.[32] On its face, HRS 378–2 <u>only</u> imposes liability on individual employees who aid and abet discrimination. As noted before, HRS § 378–2(a)(3) applies to "any person, whether an employer, employee, or not," while the remaining sections of HRS § 378–2 mention only employers or similar entities and not an "employee, or [those] not" an employer or employee.

The ICA essentially asserts that all employees who are subject to liability as an "aider and abettor" must also be subject to individual liability.[33] *See Lales,* 2012 WL 1624013, at *11. Again, in treating supervisory employees as encompassed by the term "employee" under HRS § 378–1, the ICA's reasoning would necessarily invalidate the

term "employee" in HRS § 378–2(a)(3) as superfluous. The ICA's construction thus conflicts with well-established canons of statutory construction, by including all employees within the definition of "employer." This would mean that "employee" must be read out of the statute.

## C.

Third, the ICA contends that "federal precedents that had construed Title VII as not subjecting employees to individual liability should not be followed in construing HRS Chapter 378," because Title VII imposes liability on employers with fifteen or more employees, but HRS §§ 378–1 and 378–2 impose liability on employers with one or more employees. *Lales,* 2012 WL 1624013, at *11.

As an initial matter, the legislature's purpose in defining "employer" as including "any person" with "one or more employees" in a state context under HRS § 378–1 is not evident but would not conflict with Congress's decision to exclude employers with less than 15 employees as a matter of national policy. On the face of it, the size of the employer indicates the legislative body's poli-

---

determination that "[HRS Chapter 378] does not extend to them." *Id.*

**31.** *Sherez* was disagreed with by the Ninth Circuit in *Lum,* 358 Fed.Appx. at 862. The arguments raised in *Sherez* coincide with those adopted by the ICA herein.

**32.** It has been concluded that it is not illogical to impose liability on individuals who aid and abet discrimination, but to refrain from imposing liability under HRS Chapter 378 when those individuals actually perform a discriminatory act. An employee is already subject to the regulation of his employer. *Cf. Miller,* 991 F.2d at 588 ("An employer that has incurred civil damages because one of its employees believes he can violate Title VII with impunity will quickly correct that employee's erroneous belief.") When an employee "aids or abets" discrimination two or more employees are acting together, reflecting the "systematic imbalance of power" that exists between employer and employee. *Maizner,* 405 F.Supp.2d at 1237. Thus, it is apparent that HRS § 378–2(a)(3) is aimed at people acting in concert to perpetuate discrimination, and not ordinary workplace activity requiring focused regulation. *See id.* Contrastingly, an isolated act of discrimination "does not necessarily call into play the [same] imbalance of power" *Id.*

Hence, it has been held that the legislature may have found it unnecessary to extend the remainder of HRS § 378–2 to single individuals acting independently. *Id.*

**33.** The ICA reasons that supervisory employees must be subject to individual liability as "employers" because it would be inconsistent to subject supervisory employees to liability for aiding and abetting discrimination but not for actually committing discriminatory acts. *See Lales,* 2012 WL 1624013, at *11.

This argument would apply with equal force to non-supervisory employees. Under the ICA's reasoning, it similarly would be inconsistent for a non-supervisory employee to be subject to liability only as an "aider and abettor." Hence, the ICA's analysis would subject <u>all</u> employees, whether supervisory or not, to individual liability as employers. *See id.* at *10 ("A plain reading of the statutory provisions supports the conclusion that an individual employee, who is an agent of an employer, <u>can be held individually liable as an</u> 'employer.'" (emphases added)). As explained *supra,* such an interpretation would render the term "employee" in HRS § 378–2(a)(3) superfluous and conflict with the ordinary significance of the term "employer" as not including an "employee."

cy decision as to the scope of the law, but nothing about whether the question of individual agents should be held liable as employers was even considered. Nothing in the legislative history evinces the legislature's purpose in defining "employer" more expansively than in Title VII. Thus, the size of the employer provides no basis for subjecting individual agents to liability under HRS Chapter 378.

Moreover, the distinction between the definitions of "employer" in Title VII and HRS Chapter 378 is not a "relevant detail" that renders federal precedent interpreting Title VII unpersuasive.[34] The federal courts point to Title VII's definition of "employer" as "any person with fifteen or more employees as one reason for interpreting the reference to "agent" as imposing liability on employers under respondeat superior. The federal courts reason, *inter alia,* that it would be incongruous to apply Title VII to supervisory employees but not to small businesses, because "[i]f Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees." *Miller,* 991 F.2d at 587. Therefore "[t]he statutory scheme itself indicates that Congress did not intend to impose individual liability on employees." *Id.*

Similarly, the statutory scheme of HRS Chapter 378–1 is not consistent with holding individual agents liable as "employers," as the ICA would contend. As explained *supra,* the canons of statutory construction indicate employer cannot be read reasonably as including an agent or supervisory employee. Moreover, the text of HRS § 378–2(a)(3) demonstrates that the legislature did not understand the definition of "employers" to include individuals inasmuch as when the legislature intended to impose liability on individuals, it did so explicitly by extending liability to "employees." *See* HRS § 378–2(a)(3). As noted, reading "supervisory employee" as incorporated in the term "employer" would nullify the terms "employee" or "other" in HRS § 378–2(a)(3). *See also*

*Chatman,* 973 F.Supp. at 238 (holding that imposing individual liability on supervisory agents under Title VII would be inconsistent with provisions subjecting "employers" to record keeping requirements).

### D.

Fourth, the ICA contends that *Steinberg v. Hoshijo,* 88 Hawai'i 10, 960 P.2d 1218 (1998), and *Sam Teague* support the conclusion that the definition of employer includes supervisory employees so as to subject them individually to the liability imposed on "employers" under HRS § 378–2(a)(1). *Lales,* 2012 WL 1624013, at *12. Manifestly, neither case supports this conclusion.

In *Steinberg,* the plaintiff brought suit under HRS § 378–2(a)(1)(A) for "unwelcome sexual conduct [that] created an intimidating, hostile, and offensive work environment." 88 Hawai'i at 11, 960 P.2d at 1220. The defendant was "in charge of the Clinic [where the plaintiff worked,] and [the] supervis[or] of the medical assistants and receptionists in treating patients." *Id.* In a footnote, this court noted that "[t]he parties do not dispute that [the defendant] was an agent of the Clinic and therefore an 'employer' as defined by HRS § 378–1." *Id.* at 18 n. 10, 960 P.2d at 1226 n. 10. That footnote did not purport to decide whether HRS § 378–1 could subject individuals to liability as "employers" but merely noted the lack of a dispute on the issue. *Cf. Mukaida v. Hawai'i,* 159 F.Supp.2d 1211, 1226 (D.Haw.2001) (Mollway, J.) ("[T]he very reference in *Steinberg* to the lack of a dispute raised by the parties might suggest that the court would have analyzed the issue and might have reached a different conclusion had the issue been raised."). Thus, *Steinberg* does not hold that individual agents or employees are included in the definition of employer under HRS § 378–1.

In *Sam Teague,* the plaintiff amended her complaint before the HCRC to include the president of her company in his individual capacity. 89 Hawai'i at 275, 971 P.2d at 1110. The HCRC approved the amendment,

---

**34.** *Sherez,* for example notes that some federal cases "view[ ] the fifteen or more employee requirement in Title VII critical in determining

Congressional intent with respect to individual liability." 396 F.Supp.2d at 1147–48. The ICA's reliance on this proposition is rebutted *supra.*

which was subsequently challenged by the defendant. *Id.* at 276, 971 P.2d at 1111. This court noted that although no reason was necessary, it appeared that the HCRC added the defendant to the complaint once it was discovered that he was the individual responsible for the discriminatory conduct. *Id.*

It was further stated that "[b]ecause HRS § 378–1 defines 'employer' to include agents of persons having one or more employees, the [HCRC] added [the defendant] when it discovered that [the defendant] was an agent of [the employer]." *Id.* at 276–77, 971 P.2d at 1111–12. Thus, *Sam Teague* observed that the HCRC interpreted the definition of employer in HRS § 378–1 as imposing liability on individual agents. However, that is the very issue here. Nothing in *Sam Teague* indicates the definition of employer in HRS § 378–1 was disputed by the parties. Hence, *Sam Teague* also did not resolve whether an agent or employee may be sued as an employer under HRS § 378–2.[35] In sum, neither *Steinberg* nor *Sam Teague* expressly or directly decided the question of whether a supervisory employee was an employer under HRS § 378–2.

Relatedly, contrary to the position of Lales, *Schefke* did not hold that individual employees may be held liable as "employers." In *Schefke*, the plaintiff argued that the trial court erred in granting directed verdicts on behalf of two individual defendants, the president and co-owner of the company that employed the plaintiff, and another co-owner of the company, on a retaliation claim.[36] 96 Hawai'i at 441, 32 P.3d at 85. As to the president, this court explained that the facts "could support a finding of *HRS § 378–2[ (a) ](3)* violations[,]" related to aiding, abetting, inciting, compelling, or coercing the doing of prohibited practices. *Id.* at 442, 32

P.3d at 86 (emphasis added). Similarly, as to the other co-owner of the company, this court explained that he "could be said to have at least incited the doing of the discriminatory practice forbidden by HRS § 378–2[ (a) ](2), *in violation of HRS § 378–2[a](3)*." *Id.* (emphasis added). Thus, this court's holding in *Schefke* was premised on the conclusion that, based on the facts, the president and owner could be found to be liable as "aiders and abettors," under HRS § 378–2(a)(3), which, as explained *supra*, does provide for individual liability.[37] Thus, *Schefke* does not support Lales' position that Marxen may be individually liable as an "employer."

### V.

### A.

With all due respect to the HCRC, I believe the imposition of strict liability on an employer for acts of its supervisory employees pursuant to HAR § 12–46–175(d) exceeds the scope of authority given to the HCRC under Chapter 378. This is because strict liability extends beyond the doctrine of respondeat superior inhering in HRS § 378–2 and liability principles in Section 219 of the Second Restatement. *Cf. Faragher*, 524 U.S. at 791–92, 118 S.Ct. 2275; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Consequently, HAR § 12–46–175(d) must be deemed invalid.

JN filed a Reply to the HCRC's amicus brief arguing that HAR § 12–46–175(d) exceeds the scope of the HCRC's authority because "it makes employers liable for the conduct of supervisors regardless of whether the supervisors functioned as agents of the employer, which is an expansion of the statute." Similarly, several amicus briefs filed

---

**35.** Moreover, in *Sam Teague* the defendant was the "President and sole stockholder" of a two person business. 89 Hawai'i at 272, 971 P.2d at 1107. Thus, the defendant may have qualified as an "employer" with one employee. *See* HRS § 378–1.

**36.** The plaintiff also apparently maintained that the defendants were individually liable on a compensation discrimination claim. *See Schefke*, 96 Hawai'i at 417, 32 P.3d at 61. However, this court affirmed the trial court's decision granting

a directed verdict on the compensation discrimination claim on other grounds. *Id.* at 441, 32 P.3d at 85. Thus, this court explained that "the [only] issue remaining is [the defendant's] individual liability with respect to the retaliation claim." *Id.*

**37.** In any event, inasmuch as the defendants were both co-owners of the company that employed plaintiff, they may have been "employers" under HRS § 378–1.

before the ICA urged that HAR § 12–46–175(d) was void because it exceeded the scope of HCRC's authority. Briefs by amici curiae the Chamber of Commerce of Hawai'i, the Hawai'i Employers Council, and the Hawai'i Automobile Dealers Association all argued that HAR § 12–46–175(d) was inconsistent with the legislature's intent in enacting HRS Chapter 378 and therefore should be overruled.

All three briefs contend (1) that the use of the word "agent" in the definition of employer in HRS § 378–1 only indicates a legislative intent to incorporate agency principles into HRS chapter 378, (2) that under agency law, an employer is vicariously liable for the acts of its employees only if those acts were committed in the scope of their employment, and (3) HAR § 12–46–175(d) imposes strict liability regardless of whether the employee acted within the scope of employment.

In response, the HCRC asserted that HAR § 12–46–175(d) is consistent with the agency principles elucidated in the Second Restatement. The HCRC points out that "[a]fter an extensive discussion of agency law" in *Faragher*, the Supreme Court "concluded [that] 'in sum, there are good reasons for vicarious liability for misuse of supervisory authority.'" (Quoting *Faragher*, 524 U.S. at 803, 118 S.Ct. 2275.)

### B.

As discussed *supra*, by employing the terms "agent" and "employees" in the definition of "employer" the legislature signified that both agents and employees act under the employer's direction. Consequently, the terms used in the definition of "employer" implicate the doctrine of respondeat superior.[38] *Cf. Meritor*, 477 U.S. at 72, 106 S.Ct. 2399 ("Congress' decision to define 'employer' to include any 'agent' of an employer, evinces an intent to place some limits on the acts of employees for which employers under

Title VII are to be held responsible.") (internal citations omitted). That doctrine, then, is embedded in the relationship between an employer and its agents and employees as set forth in HRS § 378–1.

As explained *supra*, by using the word "agent" in the definition of "employer" in HRS § 378–1, the legislature indicated that the doctrine of respondeat superior would determine the scope of an employer's liability for the discriminatory acts of its agents or employees. Under that doctrine, an employer may be vicariously liable for the discriminatory acts of both its agents and employees.

### VI.

### A.

An employer is vicariously liable for the torts of its agents or employees committed in the scope of their employment. *State v. Hoshijo ex rel. White (White)*, 102 Hawai'i 307, 319, 76 P.3d 550, 562 (2003) (" '[G]enerally, a principal can only be held vicariously liable for the actions of an agent under the theory of respondeat superior.'"). In *White*, this court cited the Second Restatement § 219, which indicated that a principal may be subject to liability for the acts of his agents or employees if the agents committed a tort "while acting in the scope of their employment." Second Restatement § 219(1).[39]

As explained in *White*, conduct is within the scope of employment if "(a) it is of the kind that he [or she] is employed to perform, (b) it occurs substantially within the authorized time and space limits, and (c) it is actuated at least in part, by a purpose to serve the master[.]" *White*, 102 Hawai'i at 319–320, 76 P.3d at 562–63 (quoting Second Restatement § 228). Further, an act may fall within the scope of employment even if it is forbidden by the employer. *Id.* at 320, 76

**38.** In contrast, the language of HRS § 378–1 does suggest that the legislature intended to incorporate the law of agency in HRS Chapter 378. As explained *supra*, this conclusion is consistent the federal courts' interpretation of Title VII inasmuch as the federal courts conclude that Congress' use of the term "agent" in the definition of "employer" in Title VII is "an unremarkable

expression of respondeat superior." *Birkbeck*, 30 F.3d at 510.

**39.** To reiterate, section 219(1) of the Second Restatement provides that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment."

P.3d at 563 ("[A]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment.") (quoting Second Restatement § 230).

Racial or sexual harassment usually does not fall within "the scope of employment" because it is not "actuated, at least in part, by a purpose to serve the master." In *Ellerth,* the Supreme Court stated that "the harassing supervisor often acts for personal motives, motives unrelated and even antithetical to the objectives of the employer." 524 U.S. at 757, 118 S.Ct. 2257; *see also Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422, *abrogated on other grounds by Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ("It would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business."). However, "[t]here are instances ... where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer." *Ellerth,* 524 U.S. at 757, 118 S.Ct. 2257.

In *White,* for example, the defendant, a student manager of the University of Hawai'i basketball team shouted racial slurs at a fan who was criticizing the performance of the team. *White,* 102 Hawai'i at 311, 76 P.3d at 554. This court held that "it might be concluded" that the defendant acted with the purpose of benefitting the University of Hawai'i because the fan's heckling "might [have been] reasonably perceived as interfering with the concentration or morale of the coaches or players." *Id.* at 320, 76 P.3d at 563.

### B.

Section 219(2) of the Second Restatement also provides that under certain circumstances an employer may be subject to vicarious liability for the acts of its employees even if such acts fall <u>outside</u> the scope of employment:

(2) A master is <u>not subject to liability for the torts of his servants acting outside the scope of their employment, unless:</u>

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or © the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or <u>he was aided in accomplishing the tort by the existence of the agency relation.</u>

Second Restatement § 219 (emphases added). Consequently, under section 219(2)(d), an employer generally will be found vicariously liable for the racial or sexual harassment of his supervisory employees, even if the harassment is outside the scope of employment. *See Faragher,* 524 U.S. at 802–803, 118 S.Ct. 2275. This is because such harassment will almost always be aided "by the existence of the agency relation." *Id.* "The agency relationship affords contact with an employee subjected to a supervisor's [ ] harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." *Id.* at 803, 118 S.Ct. 2275.

Thus, "[w]hen a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor[.]" *Id.* "[I]t is precisely <u>because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.</u>" *Meritor,* 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring) (emphasis added). Hence, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and, in this sense, <u>a supervisor always is aided by the agency relation,</u>" although exceptions to this rule exist. *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257 (emphasis added).[40]

In *Ellerth,* the Supreme Court explained that the terms "quid pro quo" and "hostile

---

**40.** The Supreme Court recently reaffirmed the reasoning of *Ellerth* on this point in *Vance v. Ball State University,* —— U.S. ——, 133 S.Ct. 2434, 2442, 186 L.Ed.2d 565 (2013). Thus *Vance* supports the conclusion that under the Second Restatement, exceptions exist to an employer's liability for the conduct of its supervisory employees. *Vance,* 133 S.Ct. at 2442.

work environment ... illustrate the distinction between cases involving a threat which was carried out [i.e., a tangible employment action] and offensive conduct in general." *Ellerth*, 524 U.S. at 742, 118 S.Ct. 2257. However, an employer may be aided by the existence of the agency relation regardless of whether harassment culminates in a tangible employment action. As explained by Justice Marshall in his concurrence in *Meritor*, "[a] supervisor's responsibilities do not begin and end with the power to hire, fire and discipline employees" but instead "a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace." *Meritor*, 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring).

Accordingly, as indicated by Justice Marshall, "[t]here is no reason why abuse of the latter authority should have different consequences than abuse of the former," because "[i]n both cases it is the authority vested in the supervisor by the employer that enables him to commit the wrong." *Id.* (emphasis added). Hence, it is apparent that under section 219(2)(d) of the Second Restatement, an employer will generally be liable for the harassment by his supervisory employees. *See Faragher*, 524 U.S. at 804, 118 S.Ct. 2275 (noting that there are "good reasons" for imposing vicarious liability on supervisors).

However, an employer is not automatically vicariously liable under section 219(2)(d) of the Second Restatement because "there are acts of harassment a supervisor might commit" where "the supervisor's status makes little difference." *Ellerth*, 524 U.S. at 763, 118 S.Ct. 2257. For example, where "a supervisor has no authority over an employee, because the two work in wholly different parts of the employer's business, it may be

improper to find strict liability." *Meritor*, 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring).

Under section 219 of Second Restatement, therefore, an employer would not be liable automatically for the racial or sexual harassment of his supervisory employees. Rather, it must be demonstrated that the supervisor was acting within the scope of his employment or that he was aided in the harassment by his authority. Second Restatement § 219.[41] This can only be decided on a case by case basis.

## VII.

### A.

HAR § 12–46–175(d), however, disregards agency principles in determining when an employer may be vicariously liable for the harassment of its supervisory employees.[42] Nothing in HAR § 12–46–175(d) references the Second Restatement or the agency principles discussed *supra*. Instead, as noted, HAR § 12–46–175(d) provides that "[a]n employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of ancestry regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence." (Emphases added.) By generally providing that an employer "is responsible" for the acts of its agents and supervisory employees with respect to harassment without any qualifications, the regulation plainly holds employers strictly liable. Strict liability is defined as "liability that does not depend on actual negligence or intent to harm, but that is based on the breach of an absolute duty to make some-

---

**41.** The HCRC cites the concurring and dissenting opinion in *Gonsalves v. Nissan Motor Corp.*, 100 Hawai'i 149, 58 P.3d 1196 (2002), which stated that "[a]s explained by the HCRC, within the context of supervisor harassment, absolute liability on the employer is imposed." *Id.* at 181, 58 P.3d at 1228 (Acoba, J., concurring and dissenting) (citing HAR § 12–46–109(d)). In *Gonsalves*, however, liability was not at issue. Instead, the question was whether a related provision, which the HCRC interpreted as requiring an employer to take "immediate and appropriate [corrective]

action," rendered a promise not to fire a supervisor who was accused of sexual harassment contrary to public policy. *Id.* at 181–82, 58 P.3d at 1228–29. Thus, the cited language repeated a rule as to which there was no disagreement.

**42.** Pursuant to HAR § 12–46–175(e), an employer is liable for harassment between fellow employees if "the employer, its agent, or [its] supervisory employee knows or should have known of the conduct."

thing safe." *Black's Law Dictionary* 998. Here, the employer is strictly liable for the acts of its employers inasmuch as it is liable for the harm caused irrespective of its own "actual negligence or intent to harm" and "regardless of whether the employer knew or should have known." As explained in greater detail *infra*, in its amicus briefs the HCRC characterized HAR § 12–46–175(d) as imposing strict liability on employers for the actions of their supervisors.

Moreover, the plain language of the rule disregards the qualification in the Second Restatement that an employer is vicariously liable for the acts of its supervisory employee only if the supervisor's acts occurred in the scope of employment or were aided by the agency relation with the employer. Under the Restatement approach, "[a] supervisor is [recognized as] charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace." *Meritor*, 477 U.S. at 76, 106 S.Ct. 2399 (Marshall, J., concurring). Thus, in "acting with the authority of the company," the supervisor is "aided in the agency relation" with the employer. *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257.

In the absence of a tangible employment action, a supervisor's "power and authority invests his or her harassing conduct with a particular threatening character." *Ellerth*, 524 U.S. at 763, 118 S.Ct. 2257; *accord Meritor*, 477 U.S. at 76–77, 106 S.Ct. 2399 (Marshall, J., concurring) ("[I]t is the authority vested in the supervisor by the employer that enables him to commit the wrong[.]"). However, HAR § 12–46–175(d) renders consideration of whether the supervisor was authorized or even forbidden to commit the harassment complained of irrelevant. Hence, the vicarious liability imposed by HAR § 12–46–175(d) on the employer extends even beyond the bounds drawn by Section 219 of the Second Restatement and recognized in *Faragher*.

### B.

It has been argued that the imposition of absolute liability on employers for the acts of their supervisory employees may be unfair, inasmuch as it may be unreasonable or im-

practical for employers to meet this standard. First, it may be implausible to expect an employer to be aware of all forms of harassment that occur within the workplace. *Cf. Jansen v. Packaging Corp. of America*, 123 F.3d 490, 511 (7th Cir.1997) (Posner, J., concurring and dissenting) (noting "the infeasibility of an employer's stamping out this sort of harassment without going to extreme expense and greatly curtailing the privacy of its employees, as by putting them under continuous video surveillance"). Second, even careful selection and training of employees may not ensure that an employer's supervisors will not commit acts of harassment. *Cf. id.* at 544 (Coffey, J., concurring and dissenting) (noting that "[o]nly with great difficulty (if at all) can an employer measure and detect ... the thoughts, feelings, and behavior of its employees or potential employees").

In any event, the legislature clearly intended that the HCRC would follow the law of agency in imposing vicarious liability on employers for the acts of their employees. HAR § 12–46–175(d), however, runs well beyond the boundaries of agency law. This expansion of vicarious liability renders employers liable for the tortious actions of their employees that may not have been aided by the supervisory status of the offending employees. It cannot be concluded that the legislature intended such an extension of liability without a clear and manifest command. In the absence of such a mandate HAR § 12–46–175(d) exceeds the scope of HRS § 378–2, the statutory enactment it was intended to implement. Because "an administrative rule cannot contradict or conflict with the statute it attempts to implement," and a rule conflicts with the statute if it is more expansive than the statute itself, *see Agsalud v. Blalack*, 67 Haw. 588, 591, 699 P.2d 17, 19 (1985), it must be concluded that HAR § 12–46–175(d) is invalid.

### C.

Contrary to the text of HAR § 12–46–175(d) and the construction placed on it by the HCRC, the majority intimates that "HAR § 12–46–175(d) is consistent with the theory of agency set forth in the Second

Restatement." Majority opinion at 355 n. 19, 328 P.3d at 364 n. 19. The majority infers that, based on the last sentence of HAR § 12–46–175(d), that the HCRC will examine the circumstances to determine "whether an individual acts in a supervisory or agency capacity," and "whether the supervisory employee was aided by the existence of the agency relation" before strict liability will be imposed. Majority opinion at 355 n. 19, 328 P.3d at 364 n. 19 (internal quotation marks and punctuation omitted).

However, on its face, the reference in HAR § 12–46–175(d) to the HCRC examining the circumstances of the alleged offending individual's job pertains only to whether an "individual" was acting as a supervisory employee or agent of the employer, and not to the circumstances surrounding the scope of employment or the effect of the agency relationship. For, under the rule, the fact that the acts were "authorized" or "forbidden" by the employer are expressly irrelevant for purposes of imposing liability. Similarly, that the employer actually knew or should have known makes no difference and is not relevant under the rule. The employer is considered liable without respect to any act or knowledge. Consequently, the HCRC examines an individual's relationship to his employer only to determine whether the employee is in fact an agent or supervisory employee. However, once an individual is determined to be an agent or supervisor, the employer is liable for the harassment *ipso facto*. This is because the only specific "circumstances" that are "examined" are the "employment relationships" and the "job functions performed by the individual," HAR § 12–46–175(d) (emphasis added), not the circumstances of whether the agent or supervisor was acting within the scope of employment or aided by the agency relationship with the employer. Given the plain language of the rule, that the individual was a agent or supervisor is enough to impose liability and no proof need be produced with respect or the employer's actions or knowledge or lack thereof.

Additionally, the majority's analysis of HAR § 12–46–175(d) conflicts with the HCRC's interpretation of its own regulation. In its amicus brief before the ICA, the HCRC cited HRS § 12–46–175(d) for the proposition that "in cases of supervisory harassment, the employer is vicariously liable, and there are no defenses." (Emphasis added.) Similarly, in its amicus brief before this court, the HCRC unambiguously declared that "HAR § 12–46–175(d) imposes 'strict' vicariously liability on employers for supervisor harassment." The HCRC's interpretation of HAR § 12–46–175(d) as providing no defenses to an employer in cases of supervisory harassment could not be clearer. This reading is consistent with the plain language of the regulation: it imposes strict liability on the employer without qualification.

Also, the HCRC's amicus brief before the ICA explained that the HCRC had held hearings on a petition to "eliminate parts of [the] existing rules that established vicarious liability on the part of an employer for ... harassment by a supervisor" and instead "recognize the affirmative defense created by [*Faragher*]." At a public hearing, the HCRC rejected the proposed changes but "instructed its staff to draft proposed rules to implement the [*Faragher*] defense." However, it appears that HAR § 12–46–175(d) has not been amended to date.

This confirms again that the HCRC rule imposes strict liability. If the *Faragher* defense applied, an employer would be entitled to assert as a defense that the employer exercised reasonable care to prevent and correct harassing behavior, and that Lales failed to take advantage of preventative or corrective opportunities available provided that no tangible employment action was taken. But, inasmuch as the HCRC apparently believed an amendment to HAR § 12–46–175(d) was necessary to recognize the *Faragher* defense, the HCRC plainly construed HAR § 12–46–175(d) as consistent with its assertion before the ICA and this court that there are no employer defenses to the rule.

Finally, the majority's construction also clashes with its governing precept that deference must be given to the HCRC's interpretation under *Gillan v. Government Employees Ins. Co.*, 119 Hawai'i 109, 194 P.3d 1071 (2008). According to the majority, the

HCRC's interpretation of HRS § 378–2 through its promulgation of HAR § 12–46–175(d) "should be given deference." *See* majority opinion at 355, 328 P.3d at 364. Thus, under *Gillan*, the HCRC's interpretation of HAR § 12–46–175(d) that admits of <u>no defenses</u> controls. Hence, respectfully, the HCRC's position under HAR § 12–46–175(d) that employers are strictly liable must given deference under the majority's application of *Gillan*.

### D.

Contrary to the majority's position, then, the plain language of HAR § 12–46–175(d) does not at all consider whether an agent or supervisor was acting within the scope of his authority or was aided in the agency relation, or whether the supervisor "has no authority over an employee, because the two work in wholly different parts of the employer's business." *Meritor*, 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring). The rule does not cover such situations, because under HAR § 12–46–175(d) an employer's liability for harassment is based solely on the offending individual's status as an agent or supervisor. Thus, the majority's citation to Justice Marshall's statement that employers might not be strictly liable if the supervisor is in a "wholly different part[ ] of the employer's business" clearly has no relationship to the rule but is only relevant if the Second Restatement applied. HAR § 12–46–175(d) does not embody the agency principles set forth in Section 219 of the Second Restatement as written or as applied by the HCRC. HAR § 12–46–175(d) therefore contravenes the principles adopted by the legislature in HRS § 378–1, *see* discussion *supra*, and is invalid.

### VIII.

All amici agree that it is appropriate to look to agency principles to determine the contours of the employer's liability for the harassment of its supervisors. The HCRC acknowledges that this court has applied a broad construction to an employer's liability inasmuch as "the Hawai'i Supreme Court has taken an expansive view of whether discriminatory conduct falls within the scope of an agent's employment." (Citing *White*, 102 Hawai'i at 320, 76 P.3d at 563.) The HCRC suggests that the agency principles discussed in *Faragher* support finding employers "automatically" liable for the harassment of their supervisors.

On the other hand, the Hawai'i Employers Council and the Chamber of Commerce also cite *White*, but apparently would find that an employer is not usually vicariously liable because "a supervisor ordinarily is not aided by his [or] her position of authority [i.e., aided by the existence of the agency relation] in perpetrating harassment."

Section 219 of the Second Restatement, discussed *supra*, strikes the right balance between the positions advanced by the parties and the various amici. On one hand, under the Second Restatement the employer is vicariously liable when a supervisor's position enables the supervisor to perform acts of harassment. Applying section 219 of the Second Restatement would afford plaintiffs in state harassment cases the benefit of an employer's vicarious liability for acts of supervisory employees.

On the other hand, vicarious liability should not be imposed under circumstances where the supervisor's position is not material to an act of harassment, *see Ellerth*, 524 U.S. at 763, 118 S.Ct. 2257 ("[T]here are acts of harassment a supervisor might commit which might be the same acts a coemployee would commit."), such as when the supervisor has authority over a wholly different part of the business from the complaining employee. *Meritor*, 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring). By applying section 219 of the Second Restatement, no more burden is imposed on employers than already exists in all areas of entrepreneurial endeavor. Whether a state or private claim is involved, the obligations of the employer would be the same and are well-established under existing law.

### IX.

The *Faragher* defense is irrelevant to actions under Chapter 378 because it was adopted on the basis of legislative history that was unique to Title VII and has no

analogue in the legislative history of HRS Chapter 378. As explained *supra*, a supervisor may be aided by the existence of the agency relation when he harasses other employees even when that harassment does not culminate in a tangible employment action. *Meritor*, 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring). Under such circumstances, an employer is vicariously liable for his or her supervisor's harassment. Second Restatement § 219(2)(d). Under *Faragher*, however, an employer is entitled to an affirmative defense unless harassment culminates in a tangible employment action. Thus, *Faragher* departs from the Second Restatement because under the *Faragher* defense an employer is not vicariously liable if no tangible employment action has occurred.

Furthermore, the *Faragher* defense is immaterial in applying HRS Chapter 378. "[T]he federal courts' interpretation of Title VII is useful in construing Hawai'i employment discrimination law" but the federal courts' interpretation of Title VII "is not controlling." *Nelson v. Univ. of Hawai'i*, 97 Hawai'i 376, 390, 38 P.2d 95, 109 (2001) (internal citations and quotation marks omitted). Federal law is unpersuasive when relevant differences exist between HRS Chapter 378 and Title VII. *See Furukawa v. Honolulu Zoological Soc.*, 85 Hawai'i 7, 13, 936 P.2d 643, 649 (1997) ("[F]ederal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail.").

In *Faragher*, the Supreme Court recognized that the affirmative defense it created departed from the Second Restatement inasmuch as under the section 219 of the Second Restatement, employers are usually liable for the harassment by supervisory employees. *See Faragher*, 524 U.S. at 804, 118 S.Ct. 2275. Nevertheless, the Supreme Court reasoned that it was "not entitled to recognize" the imposition of vicarious liability under the Second Restatement unless the Court could "square it with [its] holding [in *Meritor*] that an employer is not 'automatically' liable for harassment by a supervisor who creates the requisite degree of discrimination." *Id.*

The Supreme Court observed that the "Congress relied on our statements in *Meri-*

*tor* about the limits of employer liability," in enacting the Civil Rights Act of 1991. *Id.* at 804 n. 4, 118 S.Ct. 2275. Because that act "modified the statutory grounds of several of [the Supreme Court's] decisions," the decision "to leave *Meritor* intact [was] conspicuous." *Id.* Perceiving "some tension" existed between its application of the Second Restatement and *Meritor*, the Court itself devised "an affirmative defense to liability in some circumstances" to align *Faragher* with its decision in *Meritor*. *Id.* at 804, 118 S.Ct. 2275; *cf. Ellerth*, 524 U.S. at 772, 118 S.Ct. 2257 (Thomas, J., dissenting) (arguing that the Court's "holding is a product of willful policymaking, pure and simple"). The *Faragher* doctrine thus was not based on agency principles but on the Court's belief that it needed to accommodate what was presumed to be Congressional reliance on *Meritor*.

There is no comparable legislative history in Hawai'i to that described in *Faragher*. There was no decision of this court like *Meritor* inasmuch as this court has never stated that an employer is not "automatically" liable for harassment by a supervisor. Thus, the legislature could not have relied on or implicitly approved of any decision of this court purporting to limit the scope of employer's liability under chapter 378. This difference between the history of HRS Chapter 378 and Title VII renders the Supreme Court's adoption of the *Faragher* defense immaterial to HRS Chapter 378. *Cf. Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649. Hence, the Supreme Court's adoption of the *Faragher* defense is not persuasive as a reason to qualify an employer's liability under Section 219 of the Second Restatement in actions under HRS § 378-2.

In any event, the *Faragher* defense is inconsistent with the principles espoused in section 219 of the Second Restatement. Amici assert that the *Faragher* defense is compatible with the goals embodied in chapter 378 and therefore should be adopted. However, amici also maintain that "the Hawai'i legislature's use of the term "agent" in HRS § 378-[1] should be interpreted as a direction to apply general agency principles." The Second Restatement section 219 does not posit any affirmative defenses to vicari-

ous liability of the employer such as that raised in *Faragher.* Under section 219, vicarious liability is imposed under general and well-established agency principles. Any limitation on such liability already would be found in situations outside of the parameters drawn by section 219. *See Meritor,* 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring) (noting that vicarious liability may not apply if the supervisor has no authority over an employee). As a result, the creation of an affirmative defense based on negligence, such as embodied in *Faragher,* would conflict with the scope of generally accepted agency principles.[43]

## X.

The majority maintains (1) HAR § 12–46–175(d) was " 'reasonably necessary' in implementing the statute," majority opinion at 355–56, 328 P.3d at 363–64, and (2) that the legislature implicitly approved of HAR § 12–46–175(d) because a similar provision was in effect when the Hawai'i Civil Rights Act was enacted. Majority opinion at 356, 328 P.3d at 365. I respectfully disagree.

### A.

The majority first contends that "the legislature did not define the extent of an employer's liability or provide any defenses for discriminatory conduct" and so "it was reasonably necessary for the HCRC to clarify these gaps" by adopting HRS § 12–46–175(d). Majority opinion at 355–56, 328 P.3d

43. The majority holds that "HAR § 12–46–175(d) imposes strict liability on employers for the discriminatory conduct of their supervisory employees, and thus, the *Faragher* affirmative defense is not applicable to HRS chapter 378." *Id.* at 356–57, 328 P.3d at 365–66. Based on the preceding discussion herein, it is agreed that the *Faragher* defense does not apply in HRS Chapter 378 actions, but for different reasons.

44. For the same reasons, contrary to the position of the majority, *see* majority opinion at 355, 328 P.3d at 364, the HCRC's interpretation of HRS § 378–2 cannot be accorded deference. This court has explained that "[t]he rule of judicial deference does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose," and that "we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation." *In*

at 363–64 (internal quotation marks omitted). However, in including "agent" in the definition of "employer" in HRS § 378–1, the legislature intended to place some boundaries on the employer's liability for the acts of their employees, namely, those found in the law of agency. *See* discussion *supra; cf. Meritor,* 477 U.S. at 72, 106 S.Ct. 2399 (holding that by using "agent" in the definition of "employer," Congress intended the law of agency to limit employer's liability under Title VII); *Faragher,* 524 U.S. at 791–92, 118 S.Ct. 2275 (noting that *Meritor* "cited the [Second Restatement § 219] with general approval"). These boundaries do not constitute "gaps."

As explained by the Second Restatement, exceptions exist to an employer's vicarious liability for harassment by its supervisory employees. *See also Meritor,* 477 U.S. at 77, 106 S.Ct. 2399 (Marshall, J., concurring). Thus, contrary to the majority's position, HRS § 378–1 does embody "the extent of an employer's liability" under HRS § 378–2. *Cf. Meritor,* 477 U.S. at 72, 106 S.Ct. 2399; *Faragher,* 524 U.S. at 791–92, 118 S.Ct. 2275. Additionally, as discussed before, HAR § 12–46–175(d) exceeds the scope of HRS § 378–2 inasmuch as under that rule employers are automatically liable for the conduct of their supervisory employees in contradiction to agency principles. See Restatement Second § 219.[44]

### B.

Second, the majority contends that "HRS § 368–1 [45] provides that the intent of the

*re Water Use Permit Applications,* 105 Hawai'i 1, 9, 93 P.3d 643, 651 (2004) (emphasis added) (internal quotation marks omitted); *cf. Gillan,* 119 Hawai'i at 127, 194 P.3d at 1089 (Acoba, J., dissenting) ("Assuming, arguendo, the agency's application of a statute is entitled to consideration, the overriding rule is that this court is duty-bound to determine whether such application comports with the language of the statute."). As explained *supra,* the agency's reading of the statute is "incorrect" inasmuch as it ignores the limits on an employer's liability inhering in HRS Chapter 378 and as imposed by section 219 of the Second Restatement. *Cf. Meritor,* 477 U.S. at 71–72, 106 S.Ct. 2399 (noting that an Equal Employment Opportunity Commission rule imposing absolute liability on an employer for the acts of its supervisory employee is "in some tension" with section 219 of the Second Restatement).

Hawai'i Civil Rights Act, and its creation of the HCRC, was to 'preserve all <u>existing</u> rights and remedies' of the various state anti-discrimination laws.'" Majority opinion at 355–56, 328 P.3d at 364–65 (quoting HRS § 368–1) (emphasis in original). Accordingly, the majority maintains that "the legislature did not expressly foreclose the HCRC from adopting the then existing anti-discrimination rights and remedies," and that "the HCRC did not violate its statutory mandate in adopting HAR § 12–46–175(d)." Majority opinion at 356, 328 P.3d at 365.

Respectfully, the majority misreads the import of the legislative intent in preserving "existing rights and remedies." HRS § 368–1. In transferring authority to enforce anti-discrimination laws from numerous agencies, including the Department of Labor and Industrial Relations (DLIR), to the HCRC, it is evident that the legislature sought to avoid any disruption in enforcement of the law by the creation of a new agency and hence, to maintain the <u>status quo</u>. *See* HRS § 368–2. The fact that the DLIR had adopted HAR § 12–23–115(d) [46] prior to the transfer of enforcement to the HCRC did not mean the legislature "did not expressly foreclose the HCRC from adopting" HAR 12–46–175(d), majority opinion at 356, 328 P.3d at 365, but merely reflected that the regulations previously existing were not affected by the establishment of the new HCRC.

On its face, HRS § 368–1 has nothing to do with authorizing an expansion of rule making power by the HCRC, approving any particular administrative rule, or permitting the imposition of absolute liability on employers. The text and legislative history of the 1988 act do not evince a legislative intent to authorize HAR § 12–46–175(d) or any other administrative rule as coming within the bounds of Chapter 378. The general reference to "existing rights and remedies" in HRS § 368–1 thus does not establish that the legislature found that any specific rule fell within the scope of the statute.[47] Had the legislature intended to validate HRS § 12–46–175(d) by enacting HRS § 368–1, it necessarily would have said so.

In deciding whether an administrative rule is valid, this court determines whether the rule "exceed[s] the scope of the statutory enactment." *See, e.g., Stop H–3 Ass'n v. State Dept. of Transp.*, 68 Haw. 154, 161, 706 P.2d 446, 451 (1985); *Haole v. State*, 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006); *Blalack*, 67 Haw. at 591, 699 P.2d at 19. HRS § 378–2(a)(1) does not provide for the imposition of absolute liability. HAR § 12–46–175(d) would, in effect, impose "automatic" and absolute liability on employers even where the supervisor was not aided by his supervisory position in harassing another employee. As noted before, such a provision would extend employer liability beyond that

---

**45.** HRS § 368–1 provides as follows:

§ **368–1 Purpose and intent**
The legislature finds and declares that the practice of discrimination because of race, color, religion, age, sex, including gender identity or expression, sexual orientation, marital status, national origin, ancestry, or disability in employment, housing, public accommodations, or access to services receiving state financial assistance is against public policy. It is the <u>purpose of this chapter to provide a mechanism that provides for a uniform procedure for the enforcement of the State's discrimination laws. It is the legislature's intent to preserve all existing rights and remedies under such laws.</u>
(Emphasis added.)

**46.** HAR 12–23–115(d) provided as follows:

An employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of

ancestry regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The department will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in a supervisory or agency capacity.

**47.** It may be noted that "[t]he function of a legislature is to make laws, not to construe them." *Marine Power & Equip. Co. v. Washington State Human Rights Comm'n Hearing*, 39 Wash.App. 609, 694 P.2d 697, 700 n. 2 (1985). Thus, the legislature cannot " 'construe the intent of other legislatures.' " *Id.* It is a function of the judiciary to interpret statutes passed by previous legislatures. Consequently, a legislative determination that an administrative rule did not exceed the scope of a prior statute would pose "[s]eparation of powers problems." *See id.*

imposed under the common law and section 219 of the Second Restatement and as recognized under Title VII. Because nothing in Chapter 378 expressly or impliedly imposes absolute liability on an employer, HAR § 12–46–175(d) must be deemed to have exceeded the scope of HRS § 378–2(a)(1).

## XI.

Based on the foregoing, I respectfully concur in part and dissent in part.